G. B. McCLURE and B. B. Burnett, partners doing business as McClure-Burnett Commission Company

v.

The E. A. BLACKSHERE COMPANY, a body corporate.

Civ. A. No. 13730.

United States District Court
D. Maryland.

July 22, 1964.

John Marshall Jones, Jr., Brady, Jones & Hedrick and Leon H. A. Pierson, Baltimore, Md., for plaintiffs.

Francis J. Monahan, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

As originally instituted, this was a suit purportedly under the provisions of the Packers and Stockyards Act, 1921, 7 U.S.C.A. § 181 et seq. (hereinafter the Act) and particularly section 210(f). The plaintiffs, a partnership, are residents of the State of Georgia. The defendant is a Maryland corporation, with its principal place of business in Maryland.

The formal basis of the complaint was as follows:

On April 18, 1961, under the provisions of 7 U.S.C.A. § 210(e) the Secretary of Agriculture (hereinafter Secretary) passed an order directing the defendant to pay the plaintiffs the sum of $9,779.42 with interest at 5% from April 26, 1960, on a claim of $12,103.24. On May 5, 1961, on a petition to reopen and reargue the proceeding, the order of April 18, 1961 was stayed pending further order. On June 26, 1961 the Secretary passed such further order, vacating the stay order of May 5, 1961, and directing defendant to comply with the order of April 18, 1961 within thirty days from June 26, 1961. The defendant did not comply within said thirty-day period, and this action was filed after July 26, 1961, but within one year of June 26, 1961. (7 U.S.C.A. § 210(f)).

The Secretary's order of April 18, 1961 made findings of fact and conclusions of law, which it is not necessary to review at this point except to state that the Secretary correctly found that the existence or non-existence of liability of defendant to plaintiffs turned on a question of agency,[1] which the Secretary resolved in favor of plaintiffs. He then concluded:

"Under the circumstances it is concluded that respondent was not justified in refusing to pay for the livestock purchased by Griffith Baugher on April 1, 1960. Failure to pay for livestock purchased is a violation of section 307 of the Act (7 U.S.C.A. 208) when such failure to pay is without justification. See, Northwest Cattle Co. v. Iowa City Sales Co., 14 A.D. 276, 280 (1955) and East'n Livestock Com. Co. v. Rud-

---

1. Both sides, in their memoranda and arguments herein, agree that the controlling question is one of agency.

nick Livestock Sales, 9 A.D. 1085, 1086, (1950); Cf., A. C. Berry and Don O'Neill, 15 A.D. 1111, 1117, (1956)."

Defendant, before pleading to the merits, moved to dismiss, for lack of jurisdiction, the action based upon the Secretary's order, on the ground that "the Court has no jurisdiction in this case for the reason that the subject matter involved therein was not originally within the jurisdiction of the Secretary of Agriculture of the United States under Title 7, Chapter 9 of the United States Code, Packers and Stockyards Act, 1921."

The motion was briefed, and argued before the late Judge W. Calvin Chesnut of this court. He overruled the motion without prejudice. He then continued, in part:

"A reading of the findings of facts and conclusion of law of the 'judicial officer' shows what I think is a highly complex set of facts with regard to whether the balance said to be due is the legal obligation of the defendant; at least it seems to me on the mere reading of the papers that the question is thoroughly debatable and I do not find it necessary at this time to express any opinion thereon. * * * "

Defendant then answered, reserving the motion to dismiss, which was again briefed and argued before the undersigned, in conjunction with a hearing on the merits, at which the record before the Secretary was introduced, and additional oral testimony was taken.

Section 210 of 7 U.S.C.A. in applicable parts reads as follows:

"(a) Any person complaining of anything done or omitted to be done by any stockyard owner, market agency, or dealer (hereinafter in this section referred to as the 'defendant') in violation of the provisions of sections 205–207 or 208 of this title, or of an order of the Secretary made under sections 201–203 and 205–217a of this title, may, at any time within ninety days after the cause of action accrues, apply to the Secretary by petition which shall briefly state the facts, whereupon the complaint thus made shall be forwarded by the Secretary to the defendant, who shall be called upon to satisfy the complaint, or to answer it in writing, within a reasonable time to be specified by the Secretary. If the defendant within the time specified makes reparation for the injury alleged to be done he shall be relieved of liability to the complainant only for the particular violation thus complained of. If the defendant does not satisfy the complaint within the time specified, or there appears to be any reasonable ground for investigating the complaint, it shall be the duty of the Secretary to investigate the matters complained of in such manner and by such means as he deems proper.

\* \* \* \* \* \*

"(e) If after hearing on a complaint the Secretary determines that the complainant is entitled to an award of damages, the Secretary shall make an order directing the defendant to pay to the complainant the sum to which he is entitled on or before a day named.

"(f) If the defendant does not comply with an order for the payment of money within the time limit in such order, the complainant, or any person for whose benefit such order was made, may within one year of the date of the order file in the district court of the United States for the district in which he resides or in which is located the principal place of business of the defendant or in any State court having general jurisdiction of the parties, a petition setting forth briefly the causes for which he claims damages, and the order of the Secretary in the premises. Such suit in the district court shall proceed in all respects like other civil suits for damages except that the findings and or-

ders of the Secretary shall be prima facie evidence of the facts therein stated, and the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings unless they accrue upon his appeal. If the petitioner finally prevails, he shall be allowed a reasonable attorney's fee to be taxed and collected as a part of the costs of the suit."

Of the cited sections the violation of which confers jurisdiction upon the Secretary, only section 208 would seem to be even arguably applicable [2], and it was solely upon the alleged violation of that section, through a "failure to pay * * without justification" that the decision of the Judicial Officer was based.

Section 208, captioned "Unreasonable or discriminatory practices generally", reads as follows:

"It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful."

Plaintiffs of necessity must contend that these provisions relate to an ordinary debtor-creditor relationship, in which the creditor claims an amount or balance due, which the debtor refuses to pay. The conclusion of the Judicial Of-

ficer was that defendant "was not justified in refusing to pay for the livestock purchased;" and that "failure to pay for livestock purchased is a violation of" section 208 "when such failure to pay is without justification."

■ The court is unable to agree with this interpretation.

1. The duty imposed by section 208 is "to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services." It would take the most violent stretching of an elastic imagination to class the nonpayment of a bill as involving a regulation or practice in respect to the furnishing of stockyard services; a stockyard "consisting of pens, or other inclosures, and their appurtenances, in which live cattle, sheep, swine, horses, mules, or goats are received, held, or kept for sale or shipment in commerce." (section 202). It is clearly only such unjust, unreasonable, or discriminatory regulation or practice "in respect to the furnishing of stockyard services" which is prohibited and declared to be unlawful.

2. The only authorities cited by the Judicial Officer were three decisions of the Secretary. The sum of an infinite number of zeros is still zero.

3. The court has not been referred to, or found, any court decision in which this particular point has been raised and passed upon. Surely, if plaintiffs' contentions are sound, there must have been many instances where stockyard owners

2. Section 201 merely defines certain terms; section 202 defines a "stockyard" and provides for the determination by the Secretary of stockyards that come within the definition; section 203 provides for the registration of a stockyard dealer or market agency; section 205 requires every stockyard owner and market agency "to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard"; section 206 relates to rates or charges for any stockyard services; section 207 relates to filing; changing, etc., schedules of rates; section 211 deals with orders of the Secretary as to charges or practices, and generally as to rates and prac-

tices; section 212 involves prescribing rates and practices to prevent discrimination between intrastate and interstate practices; section 213 makes unlawful engaging in or using any unfair, unjustly discriminatory or deceptive practice or device in connection with receiving, etc. livestock in commerce; section 214 relates to effective date of orders; section 215 relates to forfeitures for failure to obey any order under sections 211, 212 or 213; section 216 deals with injunctions for failure to obey an order of the Secretary, "other than for the payment of money"; and section 217 relates to proceedings for suspension of orders.

have failed to pay their bills; and where procedure through the Secretary, and suit in a District Court, with the findings of the Secretary prima facie evidence of the facts therein stated, would have been found convenient by creditors.

The legislative history is uninformative on the point at issue.[3]

4. Where Congress has sought to confer authority upon the Secretary to make a money award for failure to pay a seller it has had no difficulty in clearly so stating, as in the Perishable Commodities Act. Under U.S.C.A. Title 7, section 499b(4) it is made "unlawful" for any commission merchant, dealer or broker "to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had * * *." Section 499e, makes a violator liable to the person injured thereby for amount of the damages, which liability may be "enforced * * * by complaint to the Secretary" or by suit in any court of competent jurisdiction.

5. While conceivably a consistent course of conduct, even with respect to nonpayment of bills, might in time become a "practice"[4], it is difficult to see how a single instance of the nonpayment of a bill could be so denominated.

" 'Practice' ordinarily implies uniformity and continuity, and does not denote a few isolated acts, and uniformity and universality, general notoriety and acquiescence, must characterize the actions on which a practice is predicated. * * " 72 C.J.S. Practice, pages 469, 470. See also: 33 Words and Phrases, Practice, page 179; West v. Sun Cab Company, 1931, 160 Md. 476, 482, 154 A. 100; McComb v. C. A. Swanson & Sons, D.C. Neb.1948, 77 F.Supp. 716, 734; Phillips v. City of Bend, 1951, 192 Or. 143, 234 P. 2d 572, 577; State v. Blackwell, 1941, 196 S.C. 313, 13 S.E.2d 433, 434.[5]

6. As Judge Chesnut remarked, the liability of Defendant is "thoroughly debatable." Moreover, of a claim by plaintiffs for $12,103.24, the Secretary disallowed $2,303.82 or slightly over 19%, as not merely withheld *with* justification but as not in fact owed. The undesirability of a procedure by which a disputed claim in solido is examined by the Secretary, a part found not to be owing, but the failure to pay the balance is treated, not as a simple debt, but as an unreasonable or discriminatory practice, and a violation of the Act, strongly militates against the construction urged by plaintiffs.

The court therefore holds that the Secretary had no jurisdiction to pass the

---

3. The court has studied the extracts from, and summaries of, the legislative history of the Act, as supplied by counsel for the parties, the references being Congressional Record, 67th Congress, First Session, 1921, House Bill No. 6320, 61 Congressional Record, pages 1152, 1153, 1552, 1553, 1799–1817, 1860–1863, 1885–1890, 1913–1932, 1999, 2035, 2106, 2126, 2257, 2319, 2377, 2482, 2486–2500, 2551, 2553, 2560, 2580, 2649, 2688, 2697, 2713, 2961, 3028, 3036, 4529, 4539, 4642, 4644, 4778, 4787, 4833, 4853, 4864, 4955 and extended remarks on pages 8292 and 8309.

4. The statutory reference to establishing, observing or enforcing "practices" would negative any such application of the term in this case.

5. The authorities relied upon by plaintiffs are not to the contrary. United States v. Donahue Bros., 8 Cir. 1932, 59 F.2d

1019 involved a defendant which was found to have violated the Act over a period of time by disposing of shippers' funds so as to endanger prompt accounting, and by intermingling its personal accounts with those belonging to livestock shippers. Continuity of conduct, in a number of instances, with respect to a number of different shippers and shipments clearly appears.

Swift & Co. v. United States, 7 Cir. 1963, 317 F.2d 53, related to proceedings under 7 U.S.C.A. § 192 making it a violation to use *any* unfair, unjustly discriminatory or deceptive device, or to give *any* undue or unreasonable preference or advantage "in any respect whatsoever." The court understandably held that "any" and "in any respect whatsoever" covered a single sale of 117,000 pounds of "picnics" over a thirteen day period.

order in question, and defendant's motion to dismiss the portion of the suit based thereon is granted. Had the court found that it had jurisdiction under the Packers and Stockyards Act, it would have entered judgment for plaintiffs in the amount stated in the Secretary's order, as the prima facie validity of the Findings of Fact of the Secretary were not overcome by the evidence offered in this case.

 The court, in its hearings on the motion to dismiss and on the merits as to the order of the Secretary, indicated its tentative conclusion that the matter involved was not one over which the Secretary had jurisdiction. Plaintiffs thereupon moved for leave to amend the complaint, and add a second count based upon diversity of citizenship in a controversy between the same parties, founded upon the same facts as the original complaint; and the requisite jurisdictional amount. Defendant opposed the granting of leave to amend. The motion was argued and leave to amend was granted upon the condition that the testimony of I. Bosley Baugher, now deceased, taken before the Examiner of the Department of Agriculture, be admitted into evidence in the same manner as if it had been taken by way of deposition for use in this case.[6]

The parties then stipulated that upon the amended complaint being filed and answered, the case should be heard upon the record in this court, consisting of the transcript before the Department of Agriculture, and testimony offered in open court.

With respect to the second, or diversity, count,[7] the court, having had the benefit of the record before the Department of Agriculture, additional oral testimony, and the excellent memoranda and arguments of counsel[8], finds the following facts:

Plaintiff, a partnership, both partners being citizens and residents of the State of Georgia, owned a posted stockyard subject to the provisions of the Act, and was registered with the Secretary of Agriculture as a market agency to buy and sell livestock on a commission basis, and as a dealer to buy and sell livestock for its own account. The defendant, a Maryland corporation, was registered with the Secretary of Agriculture as a dealer to buy and sell livestock in commerce for its own account, and as a market agency to sell livestock on a commission basis at a Baltimore, Maryland posted stockyard.

Prior to the transaction in question, plaintiffs and defendant had done business over a period of more than five years, during which time thousands of head of cattle had been sold by plaintiffs to defendant through the instrumentality of one Griffith Baugher (Griff) admittedly an "expressly appointed agent" of defendant. The cattle had always been billed by plaintiffs to defendant, who remitted by check, or honored plaintiffs' drafts. Until the events here involved,

6. Rule 15, F.R.Civ.P., clearly authorized the amendment if the necessary jurisdictional requirements could properly be alleged. Diversity existed and exists. The only question was whether or not plaintiffs could in good faith claim the recovery of more than $10,000. The court holds that they could. The amount claimed before the Department of Agriculture was in excess of $10,000; in their original trial memorandum on the original cause of action (order of the Secretary) they still contended that more than $10,000 was due, although admitting that in a suit on the order, only the amount allowed therein could be recovered; the Judicial Officer found that

there was a great deal of conflicting testimony as to the circumstances surrounding a substantial part of the transaction; and of course, in the diversity case not only would plaintiffs not be bound by the Secretary's order, it would not over objection even be prima facie evidence against them.

7. The evidence being the same as that offered with respect to the cause of action on the Secretary's order.

8. Counsel were industrious in their research into the legislative history (see footnote 3, supra) and the law of agency. Arguments were thorough and complete.

Griff had never purchased, and had never purported to purchase, cattle except for the account of defendant.

During this five year period the average sale negotiated by Griff had been about 200–250–300 head of cattle, involving up to $34,000. Shortly before April 1, 1960, Griff learned that plaintiffs might be able to sell some 1,000 head of cattle. He discussed this with his uncle I. Bosley Baugher, the real head of defendant, who told Griff not to buy the cattle, as it was "too much money." This instruction was not disclosed to plaintiffs, either by Griff, or by I. Bosley Baugher, although the latter testified that if an agent's services had been terminated, he would notify "everybody I could think of * * *."

On April 1, 1960, Griff ordered a string of 933 cattle from plaintiffs, with a 15% cut.[9] In fact, the cattle were ordered by Griff pursuant to an agreement with one Jack DeSarro, under which DeSarro was to recoup losses sustained in a previous transaction with defendant.[10] DeSarro was present during the negotiations with plaintiffs, but neither he nor Griff disclosed the existence of this agreement. It was at that time expected that the cattle would be shipped in three drafts of some 250 to 275 (each of which draft would not be greatly in excess of other purchases), and plaintiffs were told by Griff that they could draft on defendant when the cattle came to Baltimore, Maryland.

On April 8, 1960, 215 head were shipped to DeSarro care of defendant, and were sold by defendant. The proceeds were paid by DeSarro to plaintiffs, on advice by Griff to DeSarro that he would be repaid, which was done.[11]

On April 22, 1960, at Cordele, Georgia, DeSarro arranged with an employee of plaintiffs to include the 15% originally intended to be cut, with an adjustment in the price for the entire herd. All but 35 of the 778 head were shipped at DeSarro's instructions, fourteen cars to defendant at Baltimore, Maryland,[12] and six cars to DeSarro in Ohio. The thirty-five head not shipped were sold by plaintiffs at Atlanta, Georgia, for defendant's account. After crediting defendant with the amount received from DeSarro for the original 215 head shipped to Baltimore, a draft for the remainder (less thirty-five sold in Georgia) was drawn on defendant which refused to honor it. As the cattle were thereafter sold, from time to time, defendant accounted to plaintiffs for the proceeds.

The court further finds that plaintiffs had previously, through their bank and a mercantile agency, checked the credit of defendant; that they did not understand that DeSarro was buying any cattle, and had they so understood, they would have checked his credit; that the 215 head shipped to Baltimore were billed to DeSarro at Griff's instructions[13]; that plaintiffs would have billed whomever a purchaser directed; that there was supposed to have been one shipment a week for three weeks, but after the first shipment Griff said to hold the rest; that it was believed that Griff had directed the subsequent purchase of the 15% cut; that when the draft was turned down by defendant, one of plaintiffs telephoned him and he did not deny owing the balance but indicated that he did not have that much money then available.

Thus it can be seen that for over five years plaintiffs had dealt with defendant

---

9. Meaning that the purchaser could "cut" or reject the poorest 15% of the cattle.

10. Whether DeSarro was to get a "free ride" or was a partner with Griff is not entirely clear. DeSarro's participation would indicate a partnership. Failure, at least as far as the record goes, of either plaintiffs or defendant to proceed against DeSarro would militate against this relationship.

11. The direct testimony is to this effect. The fact that commissions were deducted would indicate that the cattle were sold for DeSarro's account.

12. DeSarro, care of Defendant.

13. This finding and those in the balance of the paragraph are based on testimony elicited by defendant on cross-examination of the plaintiffs.

through Griff, defendant's expressly appointed agent, and that there were no indicia surrounding this transaction to alert plaintiffs actually or to charge them with notice that Griff's authority was any different than it had been at any other time during those five years.

Under these circumstances the court concludes as a matter of law that although Griff did not have actual authority to contract on behalf of defendant for the purchase of the cattle in question, he did have apparent authority. The applicable rule has been clearly and forcefully set forth in Brager v. Levy, 1914, 122 Md. 554, 560–561, 90 A. 102, 104–105:

" * * * The general rule is that the power of an agent to bind his principal rests upon the authority conferred upon him by the principal, and persons dealing with an alleged agent are put upon inquiry as to the extent of his authority. The rule as to the apparent scope of an agent's authority is well stated in 31 Cyc. 1331, where it is said: 'While as between the principal and the agent the scope of the latter's authority is that authority which is actually conferred upon him by his principal, which may be limited by secret instructions and restrictions, such instructions and restrictions do not affect third persons ignorant thereof; and as between the principal and third persons the mutual rights and liabilities are governed by the apparent scope of the agent's authority, which is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses and which the principal is estopped to deny. The apparent authority so far as third persons are concerned is the real authority, and when a third person has ascertained the apparent authority with which the principal has clothed the agent, he is under no further obligation to inquire into the agent's actual authority. The authority must, however, have been actually apparent to the third person who, in order to avail himself of his rights thereunder, must have dealt with the agent in reliance thereon, in good faith, and in the exercise of reasonable prudence, in which case the principal will be bound by the acts of the agent performed in the usual and customary mode of doing such business, although he may have acted in violation of private instructions, for such acts are within the apparent scope of his authority. An agent cannot, however, enlarge the actual authority by his own acts without some measure of assent or acquiescence on the part of his principal, whose rights and liabilities as to third persons are not affected by any apparent authority which his agent has conferred upon himself simply by his own representations express or implied. Although these rules are firmly established, their application to a particular case is extremely difficult. The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent, but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had under the circumstances conferred upon his agent.' "

See also, as to principle, although on unrelated facts, Atlantic Fruit Co. v. Subscribers to Automobile Insurance Exchange, 1926, 150 Md. 470, 475, 133 A. 319, 321; Salvatorian Mission House v. Horn, 1956, 210 Md. 475, 481, 124 A.2d 268; A.L.I. Restatement, Agency, sections 27, 159; 3 Am.Jur.2d Agency, sections 73, 74, 75 and 76.

Plaintiffs have adequately proved the amount still due to them. The Clerk is directed to enter judgment for the plain-

tiffs in the amount of $12,103.24, with interest from April 26, 1960, and costs.[14]

The foregoing constitutes the court's findings of fact and conclusions of law under Rule 52(a) F.R.C.P.

14. The Judicial Officer disallowed recovery for the 15% "cut", saying that the employee of plaintiffs who "negotiated" with DeSarro, did not testify. He did testify in this case, to the effect that he

"supposed" DeSarro was to look after Griff's interest; that DeSarro was "agent" for Griff to "buy the 15% tail end", "separate" and "ship" the cattle.