Howard W. **GUENTHER**, Plaintiff,

v.

Hugh **MOREHEAD**, Sr., Hugh Morehead, Jr., and Tom A. Morehead, d/b/a Milan Livestock Auction, Defendants.

Civ. No. 6-1734-C-2.

United States District Court
S. D. Iowa,
Central Division.

Aug. 28, 1967.

Dennis Valentine and Meredith R. Griffing, Centerville, Iowa, for plaintiff.

James E. Bromwell, Cedar Rapids, Iowa, for defendants.

## MEMORANDUM AND ORDER.

HANSON, District Judge.

This action was instituted by plaintiff under the Packers and Stockyards Act of 1921, as amended, 7 U.S.C., Section 210(f), to recover for the alleged wrongful negotiation of plaintiff's check.

Plaintiff is a resident of Centerville, Iowa. Defendants Hugh Morehead, Sr., Hugh Morehead, Jr., and Tom A. Morehead, as partners in the Milan Livestock Auction of Milan, Missouri, were registered under the Packers and Stockyards Act, hereinafter called the Act, as a market agency and dealer.

On June 10, 1964, plaintiff lodged a complaint for reparation with the Department of Agriculture. The matter was investigated and an investigative report was filed on August 31, 1964. A Judicial Officer for the Department rendered a "Decision and Order" on June 8, 1965, in which plaintiff recovered the sum of $6,392.17 with interest from defendants. This action was commenced upon nonpayment of the amount declared by the Department to be due and owing.

The findings of fact and conclusions made by the Judicial Officer in the "Decision and Order" need not be meticulously reviewed at this time. However, the Court will in general relate certain factual matters and reasoning set forth therein. On or about May 5, 1964, plaintiff asked one Harold Banks to purchase some calves for him at the Milan Livestock Auction. On or about May 7, 1964, Banks falsely represented to plaintiff that he had purchased 64 head of steers at the Milan Livestock Auction for a price of $6,392.17. Plaintiff gave Banks a check payable to the Milan Livestock Auction for the amount he allegedly owed. The check bore the notation "for 64 head of cattle." Instead of applying the check on any account of plaintiff's, Banks gave the draft to Hugh Morehead, Sr., in part payment for 275 head of hogs he had previously bought. A new check was later issued to Morehead when a mistake in the check was discovered by plaintiff's bank. Plaintiff and Hugh Morehead, Sr., were present at the bank when it was issued.

The "Decision and Order" was based upon two conclusions. The first was that it was felt Morehead was on notice and therefore he was not an innocent party. This was primarily because of the notation on the first check and because of certain statements made by Morehead when the second check was issued. The second conclusion drawn was that plaintiff paid the money under a mistake of fact that he owed it to Hugh Morehead, Sr., in payment for 275 hogs previously purchased by Banks.

Two central issues are presented for the Court's determination in the instant case: (1) Whether the Department of Agriculture and the Court have jurisdiction of the subject matter under the Packers and Stockyards Act, and if so (2) Whether the decision of the Department of Agriculture can be permitted to stand.

■ There is no genuine issue as to personal jurisdiction of the defendants

herein. Any question in this regard has been waived under Rule 12(h) of the Federal Rules of Civil Procedure. Defendants, by motion, contested venue prior to answer. In addition, it would appear that Title 7 U.S.C., Section 210 (f) relates to both jurisdiction and venue.

The critical issue is whether or not the transaction complained of herein is within the purview of the Act. The plaintiff argues that this question was not presented at the administrative level and cannot now be asserted. The Administrative Procedure Act, 5 U.S.C., Section 1009(e) is cited as authority.

Section 1009(e) does not cope with the question of waiver of objections. Plaintiff probably meant to cite Section 1009 (a) as this problem is related to exhaustion of administrative remedies. Section 1009(e) provides:

"So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * in excess of statutory jurisdiction, authority, or limitations, or short of statutory right * * *."

Section 1009(e) gives courts the power to review Administrative Agency findings and conclusions at variance with its statutory jurisdiction. The general rule is that courts will not disturb administrative orders unless an error has been made in the face of an objection made at an appropriate time. United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952). However, if the defect is one "which deprives the Commission of power or jurisdiction * * * even in absence of timely objection its order should be set aside as a nullity." Id. at p. 38, 73 S.Ct. at p. 69. See also 3 Davis, Administrative Law Treatise, Section 20.06 (1958 ed.). In Manual Enterprises v. Day, 370 U.S. 478, 499, 82 S.Ct. 1432, 1443, 8 L.Ed.2d 639 (1962), the Court stated:

"The Government does not suggest that the challenge to the Post Office's power to act at all had to be made before the administrative body. That challenge presents a jurisdictional question and is open to the petitioners even if not asserted in the agency proceeding."

Thus, the fact that defendants did not raise the jurisdictional dispute at the administrative level is immaterial.

Plaintiff points to three Sections of the Act for jurisdictional support. Title 7 U.S.C., Section 206, reads as follows:

"All rates or charges made for any stockyard services furnished at a stockyard by a stockyard owner or market agency shall be just, reasonable, and nondiscriminatory, and any unjust, unreasonable, or discriminatory rate or charge is prohibited and declared to be unlawful."

Title 7 U.S.C., Section 208, prescribes that:

"It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful."

Title 7 U.S.C., Section 213, declares that:

"(a) It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with receiving, marketing, buying, or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce, of livestock.

(b) Whenever complaint is made to the Secretary by any person, or whenever the Secretary has reason to believe, that any stockyard owner, market agency, or dealer is violating the provisions of subsection (a) of this section, the Secretary after notice and

full hearing may make an order that he shall cease and desist from continuing such violation to the extent that the Secretary finds that it does or will exist."

The Supreme Court thoroughly analyzed the Congressional motives behind the Act in Stafford v. Wallace, 258 U.S. 495, 514, 42 S.Ct. 397, 401, 66 L.Ed. 735 (1922):

"The object to be secured by the act is the free and unburdened flow of live stock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and thence in the form of meat products to the consuming cities of the country in the Middle West and East, or, still as live stock, to the feeding and fattening farms in the Middle West or East for further preparation for the market.

The chief evil feared is the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer, who buys. Congress thought that the power to maintain this monopoly was aided by control of the stockyards. Another evil, which it sought to provide against by the act, was exorbitant charges, duplication of commissions, deceptive practices in respect of prices, in the passage of the live stock through the stockyards, all made possible by collusion between the stockyards management and the commission men, on the one hand, and the packers and dealers, on the other. Expenses incurred in the passage through the stockyards necessarily reduce the price received by the shipper, and increase the price to be paid by the consumer. If they be exorbitant or unreasonable, they are an undue burden on the commerce which the stockyards are intended to facilitate. Any unjust or deceptive practice or combination that unduly and directly enhances them is an unjust obstruction to that commerce. The shipper, whose live stock

are being cared for and sold in the stockyards market, is ordinarily not present at the sale, but is far away in the West. He is wholly dependent on the commission men. The packers and their agents and the dealers, who are the buyers, are at the elbow of the commission men, and their relations are constant and close. The control that the packers have had in the stockyards by reason of ownership and constant use, the relation of landlord and tenant between the stockyards owner, on the one hand, and the commission men and the dealers, on the other, the power of assignment of pens and other facilities by that owner to commission men and dealers, all create a situation full of opportunity and temptation to the prejudice of the absent shipper and owner in the neglect of the live stock, in the *mala fides* of the sale, in the exorbitant prices obtained, in the unreasonableness of the charges for services rendered."

See also De Vries v. Sig Ellingson & Co., 100 F.Supp. 781 (D.Minn.) and affirming opinion in 199 F.2d 677, 679 (8th Cir.), cert. den. 344 U.S. 934, 73 S.Ct. 505, 97 L.Ed. 719 (1952).

These observations were recently affirmed in the case of Denver Union Stock Yard Co. v. Livestock Ass'n, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771. Justice Douglas remarked that the *Stafford* decision "echoes and re-echoes with the fear of monopoly in this field." Id. at 289, 78 S.Ct. at 742. The Supreme Court accepted "the Act as written. As written, it is aimed at all monopolistic practices, of which discrimination is one." Ibid.

■■ Therefore, the very thrust of the Act was in the direction of stemming evils which were generated by monopolistic tendencies in the business. *Denver Union Stock Yard,* supra. The unrestricted free flow of livestock was to be preserved by the elimination of certain unjust and deceptive practices which were felt to be disruptive to such traffic. *Stafford,* supra.

The Act dealt with undesirable modes of business conduct by livestock concerns which were made possible by the disproportionate bargaining position of such businesses. No evidence has been adduced that shows defendants to have ever done another act such as that complained of herein. The Act does not purport to govern a single private transaction which does not arise from an inequality between the market agency or dealer and those who are forced to deal with them. The case law upon similar issues confirms this conclusion.

The Court in McClure v. E. A. Blackshere Co., 231 F.Supp. 678 (D.Md.) was presented with the question of whether the Act was applicable to the refusal of a stockyard owner to pay plaintiff for cattle which had been purchased. The Court held that the Act, more particularly Section 208, was not intended to cover an ordinary debtor-creditor situation, even though the Judicial Officer found that defendant was unjustified in refusing to pay. See also Lewis v. Goldsborough, 234 F.Supp. 524 (D.Ark.). Judge Watkins explored the various sections of the Act and concluded that Section 208 entitled "Unreasonable or Discriminatory Practices Generally" was the only section even arguably applicable. He appropriately related 231 F.Supp. on p. 681 that:

> "The duty imposed by section 208 is 'to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services.' It would take the most violent stretching of an elastic imagination to class the nonpayment of a bill as involving a regulation or practice in respect to the furnishing of stockyard services; a stockyard 'consisting of pens, or other inclosures, and their appurtenances, in which live cattle, sheep, swine, horses, mules, or goats are received, held, or kept for sale or shipment in commerce.' (section 202). It is clearly only such unjust, unreasonable, or discriminatory regulation or practice 'in respect to the furnishing of stockyard services'

> which is prohibited and declared to be unlawful."

The Court dealt with the interpretation of the word "practice" in determining on p. 682 that:

> "While conceivably a consistent course of conduct, even with respect to nonpayment of bills, might in time become a 'practice', it is difficult to see how a single instance of the nonpayment of a bill could be so denominated. 'Practice' ordinarily implies uniformity and continuity, and does not denote a few isolated acts, and uniformity and universality, general notoriety and acquiescence, must characterize the actions on which a practice is predicated." (Citations omitted.)

The cases of United States v. Donahue Bros., 59 F.2d 1019 (8th Cir.) and Swift & Co. v. United States, 317 F.2d 53 (7th Cir.) were found to be grounded upon that distinction. This Court would add Bowman v. United States Department of Agriculture, 363 F.2d 81 (5th Cir.) to the cases falling within the "continuity of conduct" category.

In Sig Ellingson & Co. v. De Vries, supra, one Tobias Brackey purchased cattle from plaintiffs by means of a worthless check. The defendant sold the cattle for Brackey and remitted the proceeds of the sale to him. Plaintiffs claimed that no title had passed to Brackey and that when defendant sold the cattle it became liable for conversion of the cattle. The Court held that 7 U.S.C., Section 181 et seq. was inapplicable and that state law was controlling. It related 199 F.2d on p. 678 that:

> "The appellant also contends here, as it did in the trial court, that the question of whether or not the market agency should be held liable in this action for conversion of the 33 head of cattle involved is a question of federal and not of state law. It does not claim that there is any provision of the Packers and Stockyards Act, nor of any other Act of Congress purporting specifically to declare the respective rights of owners of livestock who re-

linquish possession of it to pseudo purchasers for bad checks and licensed livestock market agencies that receive such livestock and sell it for the pseudo purchasers. There are no such provisions."

On p. 679 the Court elaborated that:

"The services performed by the market agencies were in the nature of public utility services vitally necessary to the movement of livestock in interstate commerce before the passage of the Packers and Stockyards Act. It was on that ground that Congress had and exercised the power to regulate them for the prevention of unjust discriminations and abuses. But Congress made no attempt to declare who should be deemed the owner of cattle turned over for a bad check nor to relieve the market agencies from liability imposed by State law for selling cattle for principals who were not the owners."

See also United States v. Kramel, 234 F. 2d 577 (8th Cir.) and Adams v. Greeson, 300 F.2d 555 (10th Cir.).

The Court will indulge in the same process of elimination utilized by the Court in *McClure,* supra. Section 205 dictates that the general duty of stockyard owners and market agencies is to "furnish upon reasonable request, without discrimination, reasonable stockyard services." This section is obviously unrelated to the situation at hand. Section 206 proscribes "any unjust, unreasonable, or discriminatory rate or charge" for "stockyard services furnished." Section 201 defines the term "stockyard services" as:

" * * * services or facilities furnished at a stockyard in connection with the receiving, buying, or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock".

It is manifest that a rate or charge means exactly what the words convey; that is, the return or commission to the market agency or dealer for furnishing stockyard services. See Section 207

(Schedule of rates; filing and exhibition; change in rates; suspension; penalties) and Section 211 (Order of Secretary as to charges or practices; prescribing rates and practices generally.)

■ It is quite apparent that the negotiation of plaintiff's check for the total amount due on 64 head of cattle cannot be linked to the regulation of an "unjust, unreasonable or discriminatory" rate of return on stockyard services "furnished." Section 212 is aimed at the prevention of discrimination between interstate and intrastate practices. Section 213 which prohibits the use of any "unfair, unjustly discriminatory, or deceptive practice or device" in relation to the previously enumerated livestock activities comes closest to conferring jurisdiction upon the Department under the Act. It would seem that there is no jurisdictional basis for the adjudication of the Department under this Section as there must be a cease and desist order and a violation thereof before a complaint for damages may be pursued. United States v. Brown, 4 F.2d 270, 271 (D.Okl.) But assuming the Department could assume jurisdiction without a previous order, there can still be no authority for it to act.

■ The word " 'practice' ordinarily implies uniformity and continuity, and does not denote a few isolated acts". *McClure,* supra.

The problem is whether or not the conduct challenged herein constitutes an "unfair, unjustly discriminatory or deceptive device." Webster defines device as:

"1. Something which is formulated by design and usu. with consideration of possible alternatives experiment, and testing: something devised or contrived: CONTRIVANCE, INVENTION, PROJECT, SCHEME: as a: a scheme to deceive or overreach: ARTIFICE, STRATAGEM * * *." Webster's Third New International Dictionary, p. 618 (1961 ed.).

instant case. The critical question is whether a market agency or dealer can This definition is not satisfactory in relation to the question presented in the

be considered to have engaged in or used an unlawful device by taking an action in only one instance, or whether like a "practice" the agency or dealer must have repeated the conduct in similar situations.

In the case of Capitol Packing Company v. United States, 350 F.2d 67 (10th Cir.), the Court held that "specified methods of dealing" which were not of themselves violations of Section 213(a) could not *in toto* become a violation. The Court on p. 77 proposed that:

"In order for a violation of section 312 (a) to be committed, a specified *manner* of dealing must be found to be unfair or deceptive. United States v. Donahue Bros., Inc., 59 F.2d 1019 (8th Cir.). In choosing the words 'unfair, unjustly discriminatory, or deceptive practice or device,' in § 312(a), specific *methods* of trade were contemplated and not a general course of dealing." (Emphasis added.)

The Court directed attention to the fact that a specific manner or method of dealing must be prohibited, not a conglomeration of innocent business transactions of a livestock concern. The ordinary usage of words such as "manner" or "method" of dealing implies a normal, customary way of approaching a particular business transaction. There would, of necessity, have to be a number of such transactions in order for the approach to become normal or customary.

Even if the language used in the *Capitol Packing* case were to be considered inconclusive, the Court is obligated to revert to the background of the words "practice or device" in the Act as previously discussed.

As directed by the Court in *Capitol Packing* on p. 76:

"The words 'unfair, unjustly discriminatory, or deceptive practice or device,' as used in § 312(a) of the Act are not defined, and their meaning must be determined by the facts of each case within the purposes of the Packers and Stockyards Act. Swift & Co. v. Wallace, 105 F.2d 848 (7th Cir.); cf. Pan American World Airways, Inc. v.

United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325."

Thus, the objectives of Congress in promulgating the Act do not permit the Court to extend its provisions to the act of negotiating plaintiff's check. The plain meaning of the Sections cannot convince this Court to do so, particularly in view of such purposes. The *McClure* and *De Vries* cases are similarly consistent with Congressional desires in excluding solitary transactions of a private nature.

Since the amount sought in the action is less than $10,000, the Court cannot treat the action as one founded upon diversity of citizenship. *McClure*, supra.

Before closing, the Court feels that it must disclose that the result reached herein is, in all honesty, due solely to its abiding conviction as to the importance of the rule of law. The Court is acutely aware that the equities unquestionably lie with plaintiff. Thus, the Court has not been without reservation in arriving at this judgment.

Accordingly, it will be ordered that the Department's Order is vacated and the Complaint dismissed.

It is noted that both the plaintiff and the defendants have asked for costs. In addition, plaintiff requests attorney's fees. Title 7 U.S.C., Section 210 (f) is controlling on these matters. That Section provides an exception to the general rule that costs are allowed "as of course to the prevailing party" under Federal Rule of Civil Procedure 54. See Notes of Advisory Committee on Rules to Rule 54. Section 210 provides that "the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings unless they accrue upon the appeal." Section 210 exonerates plaintiff from all liability for costs at this stage of the proceedings. There are no exceptions to this rule. The Section was apparently meant to encourage persons who were successful in actions before the Department to pursue their claims further by permitting them costs even though they

might lose in the district court. Were they to appeal from an adverse district court judgment, liability for costs could attach. Also, under Section 210(f), attorney's fees are not allowable to plaintiff unless and until he ultimately prevails.

Accordingly, it will be ordered that defendants pay plaintiff's costs, not including attorney's fees.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and Order for Judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.