In the Matter of SAMUELS & CO., INC., Bankrupt.

Curtis R. STOWERS, et al., Appellants,

v.

James S. MAHON, Trustee, and C. I. T. Corporation, Appellees.

No. 73–1185.

United States Court of Appeals, Fifth Circuit.

Aug. 20, 1973.

Rehearing and Rehearing En Banc Denied Oct. 31, 1973.

Lamar Holley, Dallas, Tex., for appellants.

J. Richard Gowan, Dallas, Tex., for appellees.

Before AINSWORTH, GODBOLD and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

Since 1921 packers and stockyard men in interstate commerce have been subjected to remedial federal legislation and regulation. This appeal stems from the bankruptcy of one such regulated packer, Samuels & Co., Inc., of Dallas, Texas. The issues raised, however, all question the priority of liens between a class of cattle raisers who sold their cattle to Samuels & Co. and C.I.T. Corporation, which financed their purchase.

Prior to its filing a voluntary petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., Samuels & Co. had purchased cattle under a "grade and weight basis," and C.I.T. had financed those purchases secured by a floating lien on Samuels's inventory and other property. The cattle thus sold were delivered to the bankrupt, who slaughtered the animals. The carcasses were permitted to cool and were then inspected, graded and weighed. Samuels would then issue its check for the purchase price and further process the meat into finished products. This system is common to the meat packing industry and its conditions are spelled out by regulation published in 9 Code of Federal Regulations. C.I.T. became insecure in this plan upon learning that Samuels intended to file a plan of arrangement under Chapter XI. Thus on May 23, 1969, it refused to advance additional funds for cattle purchased. On the same day Samuels filed its plan of arrangement which ultimately led to an adjudication of straight bankruptcy in April of 1970. Appellants, representing a class of cattle sellers whose cattle were delivered to Samuels before May 23, 1969, and who had received checks in payment therefor but whose checks were returned unsatisfied, filed claims for the amount of the purchase price with the bankruptcy court. That class of cattle sellers asserted a first priority lien and their position was opposed by C.I.T., asserting the superiority of its lien on Samuels inventory.

The bankruptcy court ordered a receiver to dispose of the easily spoiled meat and meat by-products but to hold the proceeds of sale pending resolution of the conflicting claims of the cattle sellers and C.I.T. The referee ultimately held the cattle sellers' interests to be paramount and subordinated C.I.T.'s lien. C.I.T. sought review in the district court, which reversed the referee, holding:

(a) That C.I.T. had a perfected lien in Samuels' inventory and other property;

(b) That the cattle delivered by May 23, 1969, and represented by the dishonored checks, were properly includable in Samuels' inventory, i. e., that C.I.T.'s lien had attached.

(c) That the class of cattle sellers had delivered goods subject to a reservation of title which, under the Uniform Commercial Code as enacted in Texas, was the mere reservation of a security interest which had not been perfected before C.I.T.'s lien attached. See Texas Business and Commercial Code § 9.312(c), V.T.C.A.

The class of cattle sellers appeal. We reverse.

The facts are undisputed. The question is one of law concerning priority of liens in bankruptcy established under the Uniform Commercial Code: Is the

reserved purchase money security interest provision, Texas Business and Commercial Code (U.C.C.),* § 9—107(1) [1] applicable to what would otherwise have given Samuels voidable title under § 2.-403 of the Code,[2] or do the regulations promulgated under the Packers and Stockyards Act, 7 U.S.C.A. § 181, et seq., comprise a course of dealing and usage of trade so as to modify the Code provisions and permit the reservation of title to have effect against C.I.T.'s lien without perfection by filing under the Code, § 9—301?

 It is clear that between a party whose security interest has attached and been perfected and one whose security interest has merely attached, that the former lien takes priority. U.C.C. § 9—301(1)(a). The latter interest is also subordinate to the rights of a person who becomes a lien creditor before the interest is perfected, and who is without knowledge of the prior security interest. § 9—301(1)(b). A trustee in bankruptcy meets these requirements. 11 U.S.C. § 107(c)(1)(B); 11 U.S.C. § 110(c). Our concern is, however, for the proper rule to be afforded the remedial legislation of the Packers and Stockyards Act and the valid regulations issued thereunder. 7 U.S.C.A. § 181 et seq., 9 C.F.R. 201.43, 201.99.

 Central to the district court's decision was the belief that the appellants' delivery of the animals while making a reservation of title acted solely as the taking of a purchase money security interest under § 9—107. This would create voidable title in Samuels. § 2—403. Thus title to the property would be in Samuels's hands at the time of bankruptcy leaving the unperfected security interest cut off by both C.I.T.'s lien on inventory and a trustee in bankruptcy's power under §§ 67 and 70 of the Bankruptcy Act.[3] Where this reasoning

---

* Numerical citation conforms to Texas Business and· Commercial Code. Quotations are taken from 1962 official draft of U.C.C. and with some numerical changes have been adopted in Texas.

1. "A security interest is a 'purchase money security interest' to the extent that it is
 (a) taken or retained by the seller of the collateral to secure all or part of its price . . . . "

2. "(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
 (a) the transferor was deceived as to the identity of the purchaser, or
 (b) the delivery was in exchange for a check which is later dishonored, or
 (c) it was agreed that the transaction was to be a 'cash sale' . . . . "

3. Section 1—201(37) of the Uniform Commercial Code defines a security interest as follows:
 "(37) 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2—401) is limited in effect to a reservation of a 'security interest'. The term also includes any interest of a buyer of accounts, chattel paper, or contract rights which is subject to Article 9. The special property interest of a buyer of goods on identification of such goods to a contract for sale under Section 2—401 is not a "security interest', but a buyer may also acquire a 'security interest' by complying with Article 9. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales (Section 2—326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."
 Its reference to § 2—401 includes a seller's reservation of title within the Code's concept of attachment and perfection of

breaks down, however, is its failure to properly account for Regulations 201.43 and 201.99 promulgated under the Packers and Stockyards Act (9 CFR, §§ 201.-43 and 201.99). Regulation 201.43 requires a packer to make its payment to his cattle suppliers promptly:

"§ 201.43 ACCOUNTS AND REC-ORDS, PACKERS AND STOCK-YARDS ACT 1921, AS AMEND-ED

(b) PURCHASERS TO PAY PROMPTLY FOR LIVESTOCK. Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and the determination of the amount of the purchase price, transmit or deliver to the seller or his duly authorized agent the full amount of the purchase price, unless otherwise expressly agreed between the parties before the purchase of livestock. Any such agreement shall be disclosed in the purchaser's records and on the accountings or other documents issued by the purchaser relating to the transaction."

Regulation 201.99 requires that until the packer pays for the carcasses the carcasses be identifiably held:

"§ 201.99 PURCHASE OF LIVE-STOCK BY PACKERS ON A CAR-CASS GRADE, CARCASS WEIGHT, OR CARCASS GRADE AND WEIGHT BASIS.

(a) Each packer purchasing livestock on a carcass grade, carcass weight, or

security interests. See § 9—113. Section 2—401 provides in part:

"Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article and matters concerning title become material the following rules apply:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2—501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties."

Thus where goods are physically delivered but title is delayed past delivery, the Code treats the transaction as the seller's retention of a purchase money security interest as defined by § 9—107(a), which must be perfected by filing before becoming superior to other later perfected liens. See § 9—312(c).

Section 2—401 (reservation of title) gives the buyer voidable title until the seller is paid. Section 9—113 provides:

"A security interest arising solely under the Article on Sales (Article 2) is subject to the provisions of this Article except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods

(a) no security agreement is necessary to make the security interest enforceable; and

(b) no filing is required to perfect the security interest; and

(c) the rights of the secured party on default by the debtor are governed by the Article on Sales (Article 2)."

Thus the seller's remedy is to reclaim the specific goods under the provisions of § 2—702(b), which provides in part as follows:

"(2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay."

We need not however decide the merits of a conflict between a trustee in bankruptcy and a seller asserting a right of reclamation, cf. In re Kravitz, 278 F.2d 820 (3rd Cir., 1960), and Glessner v. Massey-Ferguson, Inc., 353 F.2d 986 (9th Cir., 1966), for we believe the custom and usage of the meat packing industry takes the asserted reservation of title from within the definition of a security interest.

carcass grade and weight basis shall, prior to such purchase, make known to the seller, or to his duly authorized agent, the details of the purchase contract. Such details shall include, when applicable, expected date and place of slaughter, carcass price, condemnation terms, description of the carcass trim, grading to be used, accounting, and any special conditions.

(b) Each packer purchasing livestock on a carcass grade, carcass weight, or carcass grade and weight basis, shall maintain the identity of each seller's livestock and the carcasses therefrom and shall, after determination of the amount of the purchase price, transmit or deliver to the seller or his duly authorized agent a true written account of such purchase showing the number, weight, and price of the carcasses of each grade (identifying the grade) and of the ungraded carcasses, an explanation of any condemnations, and any other information affecting final accounting. Packers purchasing livestock on such a basis shall maintain sufficient records to substantiate the settlement of each transaction.

(c) When livestock are purchased by a packer on a carcass weight or carcass grade and weight basis, purchase and settlement therefor shall be on the basis of carcass price. This paragraph does not apply to purchases of livestock by a packer on a guaranteed yield basis.

(d) Settlement and final payment for livestock purchased by a packer on a carcass weight or carcass grade and weight basis shall be on actual (hot) carcass weights determined before shrouding. The hooks, rollers, and gambrels or other similar equipment used at a packing establishment in connection with the weighing of carcasses of the same species of livestock shall be uniform in weight. The tare weight shall include only the weight of such equipment.

(e) Settlement and final payment for livestock purchased by a packer on a USDA carcass grade shall be on an official (final, not preliminary) grade. If settlement and final payment are based upon any grades other than official USDA grades, such other grades shall be set forth in detailed written specifications which shall be made available to the seller or his duly authorized agent. For purposes of settlement and final payment for livestock purchased on a grade or grade and weight basis, carcasses shall be final graded before the close of the second business day following the day the livestock are slaughtered."

These regulations had binding effect on Samuels, whose compliance therewith permitted it to continue its operations.

C.I.T. responds to appellants' arguments under the Code, § 1—205,[4] by ob-

---

4. "(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

serving that the regulations are not inconsistently applied and are but a means to implement a seller's right of reclamation provided by U.C.C. § 2—702(b).

Like the district court's conclusion on the application of § 9—107(b), C.I.T.'s argument misses the unique pattern of the Packers and Stockyards Act and Regulations. Meat and meat by-products of like grade and weight are, as the referee found, fungible goods:

"When the livestock has been graded and the yield determined the meat is processed, packaged and sold. After the livestock has been processed and packaged, it is impossible to trace or identify any seller's particular livestock."

▮▮▮ The Packers and Stockyards Act regulations are a recognition that once a check has issued from a packer, the carcass will be processed and its identity lost. Consequently, the "hot check" provision of U.C.C. § 2—403(a)(2) is an unavailable remedy. The Packers and Stockyards regulations and cases, therefore, consider the packer's obligation to pay to be that of a fiduciary, Bowman v. U.S.D.A., 363 F.2d 81 (5th Cir., 1966), and the purpose of the act to be the protection of the producer's and consumer's purse. *Bowman, supra;* Glover Livestock Co. v. Hardin, 454 F.2d 109 (8th Cir., 1972); Bruhn's Freezer Meats of Chicago, Inc. v. U.S. D.A., 438 F.2d 1332 (8th Cir., 1971); Swift & Co. v. United States, 393 F.2d 247 (7th Cir., 1968). The reasoning of these cases and the impact of the Packers and Stockyards Act convinces this court that more than an unperfected security interest subject to reclamation is reserved for the cattle seller. Not by contract but by statute and regulation a packer lacks full dominion over the carcasses until the seller has been paid. Where the packer defaults by the issuance of a bad check (and destroys the identity of the security by processing the carcasses into fungible meat products), the seller is the beneficiary of a trust imposed by remedial statute. This we must note was the very statute which permitted the bankrupt to engage as a meat packer in interstate commerce and it is clear that the Packers and Stockyards Act and Regulations 201.42 and 201.99 thereunder comprise a course of dealing and usage of trade known to both the bankrupt packer and C.I.T., which had financed it for an extended period.

The judgment of the district court is reversed and remanded with directions to reinstate the judgment of the referee.

GODBOLD, Circuit Judge (dissenting):

I am unable to join with the majority in their decision that the Packers & Stockyards Act, 7 U.S.C. § 181 et seq., and the regulations issued thereunder, prevail over the Uniform Commercial Code by imposing a trust upon proceeds of sale of meat products processed from cattle carcasses delivered by the sellers, thus entitling the sellers to recover as beneficiaries of the trust. Neither the general scope of the Act nor the specific regulations relied upon support the majority's conclusion. Prior cases in this circuit and elsewhere have rejected contentions that with respect to matters not specifically covered by it, the Act supplanted what might be termed commercial law of the states.

The District Court concluded as a matter of law that CIT had a perfected lien on the inventory and accounts receivable of Samuels & Co., Inc. ("Samuels") which prevailed over the rights of the sellers under the U.C.C., as adopted by the State of Texas, Tex.Bus. & Comm.Code Ann. § 1—101 et seq. (Tex.

---

(5) An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance.

(6) Evidence of a relevant usage of trade offered by one party is not admissible unless and until he has given the other party such notice as the court finds sufficient to prevent unfair surprise to the latter."

U.C.C. 1968) and rejected the conclusion of the referee that the interests of the sellers were paramount.[1] The majority majority reverse the District Court's conclusion of law and reinstate that of the referee.

The majority conclude that in certain circumstances the Act, considered together with the regulations and the usages of the trade, imposes a trust upon proceeds in the hands of a meat packer, received by the packer from the sale of meat products. The "certain circumstances" are these: the cattle must have been received by the packer in the type of transaction well known to the trade and described by 9 CFR 201.99, pursuant to which regulation the packer is required to maintain the identity of carcasses when the animals are killed and also maintain sufficient records concerning the carcasses; and the packer has destroyed the identity of the carcasses by processing them into fungible meat products.[2] Under these circumstances the majority impress a trust relationship with the consequence that Samuels has less than full title, and the seller, as beneficiary of the trust, has an equitable interest conferring on him a status superior to that of CIT which, as secured creditor, held a lien on the inventory and accounts receivable of Samuels. Obviously this does considerable violence to the state commercial law concerning passage of title to chattels, manner of perfecting liens, and the protective scope of liens. The predicate for this imposition of a trust consists of implications drawn from the overall scheme of the Act and from Regulation

201.99, neither of which expressly makes Samuels a fiduciary.

The Act was promulgated in 1921 as a regulatory and antitrust act to deal with monopolistic and deceptive practices of the major stockyards and meat packers. Stafford v. Wallace, 258 U.S. 495, 42 S. Ct. 397, 66 L.Ed. 735 (1922); Denver Union Stock Yard v. Producers Livestock Marketing Ass'n, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958). In 1958 and 1968 it was amended to meet changed conditions in the industry by authorizing broader authority for regulation by the Secretary of Agriculture and by more precisely delineating the division of authority between the Federal Trade Commission and the Secretary of Agriculture. 1958 U.S.Code Cong. & Admin.News p. 5213; 1968 U.S.Code Cong. & Admin.News p. 2864.

I am unable to find, nor do the majority refer to any legislative history evidencing Congressional intent that—except to the extent specifically done—the Act should supplant or modify the general body of state laws governing commercial transactions. Congress has not undertaken to regulate every aspect of the packing and stockyards industry, so state law continues to fill out the federal regulatory scheme. Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); Chemical Specialties Manufacturers Ass'n, Inc. v. Clark, 482 F.2d 325 [1973].

In numerous cases the contention has been repeatedly made that the Act, by its overall regulatory sweep of the industry or by implications drawn from

---

1. Neither the District Court nor this court is bound by the clearly erroneous rule in reviewing conclusions of law made by a district court in its review of a referee's order. International Minerals & Chemicals Corp. v. Moore, 361 F.2d 849 (CA5, 1966). I perceive no factual problems in this appeal. The District Judge adopted the referee's findings of fact as not clearly erroneous and the majority, under the same standard of reviewing the underlying facts pursuant to the plainly erroneous rule, Bazemore

v. Stehling, 396 F.2d 701 (CA5, 1968), consider the facts as not in material dispute. I do not disagree with that conclusion.

2. The majority opinion refers at one point to the fact that in purported payment for the cattle the packer has issued checks not honored by the bank, as being a factor in triggering the imposition of a trust. This would seem to be a breach of trust rather than an incident giving rise to its existence.

its specific provisions, has supplanted or modified commercial law of the states.[3] In Sig Ellingson & Co. v. DeVries, 199 F.2d 677 (CA8), cert. denied, 344 U.S. 934, 73 S.Ct. 505, 97 L.Ed. 719 (1953), plaintiff sold his cattle to Brackey and received a worthless check. Brackey then sold the cattle through defendant Ellingson, a livestock commission merchant licensed as a market agency under the Act. Plaintiff sued Ellingson for conversion. The District Court found that under applicable state law (of Iowa and Minnesota) title does not pass to one paying with a worthless check, so that ownership and right to retake possession remained in plaintiff who was thus entitled to recover from Ellingson. Ellingson recognized that the Act did not purport to declare specifically the respective rights of owners and market agencies in such a situation. It contended, however, that the overall regulatory scheme of the Act, which treats stockyards and market agencies as public utilities and imposes regulations upon them, and the specific provisions of the Act requiring nondiscriminatory practices and prohibiting unjust, unreasonable and discriminatory practices and depriving the commission merchant of the freedom to choose his own customers, overrode the state law which made the market agency liable for conversion of the cattle. The Eighth Circuit rejected this as had the District Court, saying:

▮ But it appeared to the trial court that the liability of the defendant market agency to plaintiffs which resulted from its sale of the cattle under the law of Iowa and of Minnesota was not affected either by the terms or by necessary implications of the federal Act. The services performed by the market agencies were in the nature of public utility services vitally necessary to the movement of livestock in interstate commerce before the passage of the Packers and Stockyards Act. It was on that ground that Congress had and exercised the power to regulate them for the prevention of unjust discriminations and abuses. But Congress made no attempt to declare who should be deemed the owner of cattle turned over for a bad check nor to relieve the market agencies from liability imposed by State law for selling cattle for principals who were not the owners. The Act was aimed at unjust discriminations incompatible with public utility operations, but it in no wise impairs the freedom of the market agencies to adopt proper measures to prevent and suppress frauds. The court was convinced that the Act has not superseded the law of Iowa or of Minnesota under which the defendant in this case became liable to the plaintiffs.

The opinion of the trial court and cases cited reflect that earnest arguments have been presented on behalf of the livestock market agencies to the effect that the law governing their liability or immunity in such a case as is here presented ought to be uniform at all the markets regulated under the federal Act and that the agencies ought not to be held liable for conversion in respect to cattle sales made under such circumstances as are found in this case. There are also cogent considerations of the same abstract character tending strongly to contrary conclusions. But we see no occasion to add further to that discussion. We find no error in the conclusion of the trial court that the Packers and Stockyards Act does not, either by express provision or by necessary implication, establish the rights of the parties to this action resulting from the sale of the 33 head of cattle. State law is controlling and we find no error in the declaration and application of that law by the trial court.

199 F.2d at 679. A companion case reached the same result. Sig Ellingson

---

3. Some cases are pre-U.C.C., others post-U.C.C., which is of no moment, since the issue is whether the Act supplants or modifies state laws of commercial transactions, statutory or non-statutory.

& Co. v. Butenbach, 199 F.2d 679 (CA8), cert. denied, 344 U.S. 934, 73 S. Ct. 505, 97 L.Ed. 719 (1953).[4]

Subsequently on facts parallel to those of *Ellingson* the Tenth Circuit gave effect to the law of Arkansas, producing an ultimate result on liability precisely the opposite of the result in *Ellingson*. Under Arkansas law one giving a worthless check acquires defeasible title, so that a commission agent who sold cattle for such a person was not liable to the original owner who had parted with the cattle for the worthless check. Adams v. Greeson, 300 F.2d 555 (CA10, 1962).

In 1954 this circuit followed the two *Ellingson* cases and held that the Act did not absolve market agencies from liability under Texas law for sale of cattle obtained by worthless check. John Clay & Co. Livestock Commission v. Clements, 214 F.2d 803 (CA5, 1954).[5]

Numerous state cases, including a Texas case, have rejected arguments that the Act has supplanted state law in various commercial transaction contexts. Walker v. Caviness, 256 S.W.2d 880 (Tex.Civ.App.1953), Mason City Prod. Credit Ass'n. v. Sig Ellingson & Co., 205 Minn. 537, 286 N.W. 713, cert. denied, 308 U.S. 599, 60 S.Ct. 130, 84 L.Ed. 501 (1939), and Moderie v. Schmidt, 6 Wash.2d 592, 108 P.2d 331 (1940) [market agent liable for sale of mortgaged or stolen cattle]; Birmingham v. Rice Bros., 238 Iowa 410, 26 N.W.2d 39, 2 A.L.R.2d 1108 (Iowa), cert. denied, 332 U.S. 768, 68 S.Ct. 79, 92 L.Ed. 353 (1947) [same facts as in Ellingson v. DeVries, *supra*]. See also, First Nat. Bank v. Siman, 67 S.D. 118, 289 N.W. 416 (1939), and Citizens State Bank v. Farmers Union Livestock Co-op Co., 165 Kan. 96, 193 P.2d 636 (1948).

The only federal case contrary to the above body of case law appears to be Sullivan & Co. v. Wells, 89 F.Supp. 317 (D.Neb.1950), decided prior to the *Ellingson* cases, Adams v. Greeson, and the decision of this circuit in John Clay & Co., and relying upon what was recognized to be a minority view originating from state courts in Missouri and Kentucky.

While tangential to the case before us, which does not directly relate to powers of the Secretary of Agriculture, a body of case law points out that certain efforts of the Secretary to act with regard to matters governed by the commercial law of the states are beyond the jurisdiction conferred upon him by the Act. In Guenther v. Morehead, 272 F.Supp. 721 (S.D.Iowa, 1967), Banks falsely represented to plaintiff that he had purchased 64 head of cattle for plaintiff at Milan Livestock Auction, and plaintiff gave Banks a check payable to Milan

4. Some of the history behind Sig Ellingson & Co. v. DeVries is of interest. The court relied in part on Birmingham v. Rice Bros., 238 Iowa 410, 26 N.W.2d 39, 2 A.L.R.2d 1108; 332 U.S. 768, 68 S.Ct. 79, 92 L.Ed. 353 (1947). That case had, in turn, referred to Mason City 'Prod. Credit Ass'n v. Sig Ellingson & Co., 205 Minn. 537, 286 N.W. 713, cert. denied, 308 U.S. 599, 60 S.Ct. 130, 84 L.Ed. 501 (1939), which had held the act did not free market agencies of liability under state law for selling mortgaged cattle. According to the court in *Birmingham*, the Solicitor General of the United States appeared in the Supreme Court in *Mason City* to oppose the petition for a writ of certiorari, which was refused.

5. Sebastopol Meat Co. v. Secretary of Agriculture, 440 F.2d 983 (CA9, 1971) is not contrary to the above case law. The Secretary issued a cease and desist order against a corporation which was a packer, and an individual who was its alter ego but not a packer, for failure to pay for livestock, in violation of 9 C.F.R. § 201.43(b), thereby violating 7 U.S.C. § 192(b) which authorizes cease and desist orders against packers. The only issue on appeal was whether state law limitations on the alter ego doctrine prevented the cease and desist order from running against the individual. The court held that a remedial order, which the Secretary was empowered by a federal regulatory statute to' issue, and which unquestionably reached the corporation, could not be thwarted by state limitations on the alter ego doctrine which was usually invoked in private litigation.

bearing the notation "for 64 head of cattle." Instead of applying the check to any account of plaintiff, Banks gave it to Milan in part payment for hogs he had previously bought. Plaintiff complained to the Secretary of Agriculture who, under 7 U.S.C. § 210(e), ordered Milan to repay plaintiff. Milan refused to pay and plaintiff sued to enforce. The court considered 7 U.S.C. §§ 206, 208, 212 and 213, and concluded that Milan's wrongful negotiation of plaintiff's check for a purpose other than that noted on its face was a matter outside the Secretary's jurisdiction. 272 F.Supp. at 721. In McClure v. E. A. Blackshere Co., 231 F.Supp. 678 (D.Md. 1964), the Secretary of Agriculture had entered an order awarding damages, pursuant to 7 U.S.C. § 210(e), directing a dealer to pay sellers for cattle sold. The defendant refused to comply and the sellers sued on the order under § 210(f). The District Court found that the Secretary had no jurisdiction to enter the order. It considered 7 U.S.C.A. §§ 201–203, 205–207, 211–217 and rejected their applicability. The Secretary had based his order on the theory that an unjustified failure to pay for livestock purchased was a violation of § 208, requiring market agencies to establish and observe just and reasonable practices in respect to the furnishing of stockyard services and forbidding contrary practices. The court found that this was the only section of even arguable application, and, after considering a mass of legislative history and finding it uninformative, at page 682 footnote 3 of 231 F.Supp., found that the section did not relate to ordinary debtor-creditor relationships.[6]

The language of Regulation 201.99 does not specifically make the packer a trustee of either cattle purchased or of the proceeds. It imposes upon the packer duties to make known to the seller the details of the purchase contract, to identifiably maintain the livestock and the carcasses therefrom, to transmit a written account of the purchase, and to maintain sufficient records.[7]

Samuels was a packer, one who buys livestock for slaughter, manufactures and prepares the meat and stock for sale or shipment in commerce, and markets the meat in commerce. 7 U.S.C. § 191. The deleterious acts of packers at which the Act was directed consisted of monopolistic and discriminatory market practices. See Armour & Co. v. United States, 402 F.2d 712 (CA7, 1968); Swift & Co. v. United States, 393 F.2d 247 (CA7, 1968); Swift & Co. v. United States, 317 F.2d 53 (CA7, 1963). The packer's role in the industry is different from that of market agencies and dealers, and the Act and the regulations recognize this and treat him differently. The financial abuses at which the Act was directed were those of market agencies and dealers and stockyards. A market agency buys and sells cattle on a commission basis or furnishes stockyard services, 7 U.S.C. § 201(c), and a dealer buys and sells cattle, 7 U.S.C. § 201(d). Market agencies and dealers must register, 9 CFR 201.10, and must be bonded to secure their financial obligations. 7 U.S.C. § 204, 9 CFR 201.27–34. As early as 1923 the Secretary promulgated a regulation which prohibited market agencies from using funds of owners or consignors of livestock or mingling such funds with its own, a regulation which

---

6. Branscome v. Schoneweis, 361 F.2d 717 (CA7, 1966), sustained an order of the Secretary awarding damages for a bad check given by a market agency. Issues of jurisdiction and authority were not referred to and presumably were not raised.

7. On the record before us it is not shown that Samuels breached any of these duties. All say that it is impossible to trace the carcasses of the livestock sold by plaintiffs into identifiable monetary proceeds, but the reason for this is not shown to be any default by Samuels of its obligations, which do not extend to keeping records that will record the path of specific cattle into identifiable cuts of meat or hamburger or identifiable sales. Samuels' breach of obligations was by giving a check which the bank would not honor, a matter not governed by this regulation, and, as previously discussed, rejected by several courts as the basis for jurisdiction under the Act.

made the market agency a fiduciary in relation to the proceeds of sales of livestock handled by it for customers. United States v. Donahue Bros., 59 F.2d 1019 (CA8, 1932). The present regulations continue the fiduciary relationship, forbid the market agency from using customers' fund for its own purposes either directly or through the "float" in the agency's bank account, and specifically require maintenance of a separate custodial bank account for these funds held as fiduciary. 9 CFR 201.40, 201.-42; Bowman v. United States Dept. of Agriculture, 363 F.2d 81 (CA5, 1966). The financial practices of packers are not regulated in the same manner, they are not bonded to secure their financial obligations, and they need not segregate funds. The cases which the majority .cite as imposing a fiduciary duty on Samuels involved regulatory violations and financial abuses by stockyard owners, market agencies, and dealers, not by packers. Bowman v. United States, *supra;* Glover Livestock Commission v. Hardin, 454 F.2d 109 (CA8, 1972); United States v. Donahue Bros., Inc., *supra.*[8] The Act gives a private cause of action against stockyards, market agencies and dealers, 7 U.S.C. § 209, but none against packers, who are subject to administrative charges at the hands of the Secretary. 7 U.S.C. §§ 191–95.

At the end of their opinion the majority refer to 9 CFR 201.43 which requires a packer to promptly pay sellers, as a custom and usage of the trade binding on Samuels and CIT. The U.C.C. itself provides for consideration of industry usages and practices, which may constitute part of the agreement made by parties, §§ 1—201 and 1—205, but the effect of incorporation of usage and practice into the agreement is also governed by the U.C.C. § 1—102(c). De-

livery of goods with a duty on the recipient to promptly pay does not, under U.C.C., alter the consequence that title passes upon delivery with the seller having only a seller's security interest, § 2—401, which in the circumstances of this case (no financing statement having been filed and no notice given to CIT, § 9—312(c)) is junior to the lien of a secured creditor, or having a right to reclaim under § 2—507 and 2—702 (in this instance, not timely asserted). Thus custom and usage are employed by the majority to override the specific provisions of state law which provide both for giving effect to custom and usage and the consequence of doing so, and to produce an ultimate result the reverse of that commanded by state law.

Of course, there are areas of state commercial laws which are modified or supplanted by federal regulatory measures. The Miller Act, 40 U.S.C. § 270a et seq., and bonds furnished under it, present matters for application of federal law, Indemnity Insurance Co. v. Browning-Ferris Mach. Co., 227 F.2d 804 (CA5, 1955), as do surety bonds required of market agencies and dealers under the Packers & Stockyards Act, USF&G v. Quinn Bros., 384 F.2d 241 (CA5, 1967). But these spring from specific statutory provisions—in the case of the market agency or dealer, 7 U.S.C. § 204 authorizes the Secretary to require the bond under rules and regulations which he may, and has, prescribed, 9 CFR § 201.27, et seq.—or by implication in circumstances different from those here present. The history and the language of the Act, the language of Regulation 201.99, the pattern of regulations making fiduciaries of others in the industry, and the case law all are inconsistent with overriding state law by implication in this instance.

---

8. Bruhn's Freezer Meats v. U. S. D. A., 438 F.2d 1332 (CA8, 1971), refers to the Act's permitting the Secretary to exercise as broad a control of packers as the Constitution permits. The statement must be considered in the context of the case, which concerned whether a chain of meat freezer plants was a packer and whether its misrepresentations and similar sales tactics were deceptive practices under 7 U.S.C. § 192(a), both of these matters being inquiries plainly within the scope of the Act.