UNITED STATES FIDELITY AND
GUARANTY COMPANY,
Appellant,

v.

QUINN BROTHERS OF JACKSON,
INC., Appellee.

No. 22889.

United States Court of Appeals
Fifth Circuit.

Sept. 19, 1967.

---

8.   Benson v. Gladden, 242 Or. 132, 407 P.2d 634.

½

Cary E. Bufkin, Jackson, Miss., for appellant.

Charles Clark, Jackson, Miss., for appellee.

Before RIVES, GEWIN and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This is a suit on a Packers and Stockyards Act[1] bond in which Quinn Brothers secured a jury verdict against U.S.F. & G., the surety.

The bond was made by T. B. Saunders (d/b/a T. B. Saunders and Company) as principal. Saunders was registered[2] with the Secretary of Agriculture as a market agency[3] furnishing what is known in the stockyards business as "clearing services."[4] By authority of 7 U.S.C.A. § 204 the Secretary may require a reasonable bond from every market agency and dealer[5] under such rules and regulations as he may prescribe.[6]

1. 7 U.S.C.A. § 181 et seq.

2. 7 U.S.C.A. § 203 provides that 30 days after a stockyard is posted as provided in the Act no one shall carry on the business of a market agency or dealer at such stockyard unless he has registered "under such rules and regulations as the Secretary may prescribe". The Secretary has promulgated regulations implementing the registration requirement. 9 C.F.R. § 201.10 et seq.

3. "Market agency" is defined by 7 U.S.C.A. § 201(c) as "any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services".

"Stockyard services" are defined by 7 U.S.C.A. § 201(b) as "services or facilities furnished at a stockyard in connection with the receiving, buying, or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling in commerce, of livestock".

4. The terms "clearing service" and "clearing agency" do not appear in the Act, but are found in § 201.39 of the regulations:

"* * * The bond of every registrant, acting in the capacity of a clearing agency, and thereby being responsible for the financial obligations of other registrants, shall show the name of the person for whom the clearing agency holds itself out to be responsible and whose obligations are covered by the bond * * * The amount of each such bond will be computed on the basis of the volume of business handled by the registrant * * *"

5. "Dealer" is defined in 7 U.S.C.A. § 201 (d) as "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser."

6. Pursuant to this authority the Secretary has promulgated regulations implementing the bonding requirement. 9

Saunders provided clearing services for twenty-three livestock dealers including Norman Gibson; each was registered with the Secretary as a dealer. The regulations make clear that a dealer can satisfy the statutory bonding requirement by executing and maintaining a bond himself or by becoming a registrant on the bond of a market agency performing clearing services.[7] Gibson chose the latter method and was included as a registrant on Saunders' bond. Saunders' bond followed the form prescribed by the regulations; the pertinent provisions are set out in the margin.[8]

The procedure followed by Saunders essentially was as follows. He maintained an office and facilities at the Fort Worth Stockyards. A dealer would set up an account with Saunders and make a deposit of funds to go into the account. Saunders took appropriate steps to have the dealer approved and included as a registrant on his bond. If the dealer-registrant desired to clear a transaction through Saunders, he would, in most instances, pay for the stock with a draft drawn on Saunders, and Saunders testified that he requested the dealer-registrants to pay with such drafts, but it is clear that under some circumstances payment would be made in cash without issuance of a draft.

If the amount to be paid by Saunders as clearing agent was more than the dealer's balance in his account, Saunders would advance the necessary funds to the account. When the dealer re-sold livestock the purchase of which had been cleared through Saunders all proceeds were put into the account with Saunders.

Saunders indicated that he reserved the right to refuse payment on any draft for which prior arrangement with him had not been made, but such drafts were never refused if the dealer's account had sufficient funds to cover them. When a dealer planned a trip to a location away from the Fort Worth Stockyards he would made advance arrangements for Saunders to accept drafts.

Dealers included on Saunders' bond were not required to clear all their transactions through Saunders—they could clear through another agency or pay by cash or some other means. Saunders received from $.50 to $.30 per head (depending on volume) of all stock cleared through him, plus 8% interest on funds advanced to a dealer's account. These

C.F.R. § 201.27 et seq. Although these regulations recently have been amended [30 F.R. 8513, July 3, 1965], all references herein will be to those regulations in effect at the time of the transactions at issue.

7. 9 C.F.R. § 201.29.

8. "Now, therefore, the condition of this bond is such that:
"If the said Principal, acting in the capacity of broker or clearing agency, and thereby being responsible for the financial obligations of other registrants, viz:

\*　　\*　　\*　　\*　　\*

NORMAN GIBSON

\*　　\*　　\*　　\*　　\*

shall (1) pay, when due, to the person or persons entitled thereto the purchase price for all livestock purchased by such other registrants; (2) safely keep and properly disburse all funds coming into the hands of said Principal for the purpose of making such purchases; and (3) safely keep and faithfully and promptly account for and pay to the owners or their duly authorized agents the proceeds of sales of all livestock received for sale on a commission basis by such other registrants for whom said Principal acts as broker or clearing agency, then this bond shall be null and void; otherwise to remain in full force and virtue.

\*　　\*　　\*　　\*　　\*

"The acts, omissions, or failure of authorized agents or representatives of said Principal or persons whom said Principal shall knowingly permit to represent themselves as acting for said Principal, shall be taken and construed to be the acts, omissions, or failures of said Principal and to be within the protection of this bond to the same extent and in the same manner as if they were the personal acts of said Principal.

"This bond may be terminated by either party hereto by delivering a written notice of termination to the other party and to the Chief of the Packers and Stockyards Branch at Washington, D.C., at least ten (10) days prior to the effective date of such termination."

rates had to be approved by the Secretary and posted in a conspicuous location at Saunders' place of business. 9 C.F.R. § 201.22.

In his application for registration with the Secretary, Saunders stated he would operate at the Fort Worth Stockyards, Fort Worth, Texas. He posted his tariff in his office at that yard.

During the week of July 20, 1964, Gibson discussed with Quinn Brothers at the Union Stockyards, a posted yard under the Act, in Jackson, Mississippi, the purchase of cattle from them. Representations were made by Gibson concerning clearing service furnished him by Saunders. Quinn had never done business with Gibson but knew Saunders because purchases made from Quinn by another dealer who was a registrant on Saunders' bond had been satisfactorily cleared through Saunders. The scope and details of Gibson's representations and of a telephone call made by Quinn to Saunders' office in Fort Worth are in dispute, but these were factual matters for the jury. A few days thereafter, in late July, Quinn sold a load of cattle to Gibson and in payment received a draft drawn by Gibson on Saunders, which Saunders honored.

On August 7 Gibson purchased a second load from Quinn, twice as many cattle as before. It is out of this sale that the claim in suit arises. There was no discussion about clearing the transaction through Saunders, and no draft was issued. The cattle were shipped, Gibson paid part of the purchase price by cashier's check and did not pay the balance. Gibson used the proceeds of re-sale of the cattle to pay various obligations, including a substantial indebtedness to Saunders arising out of other transactions.

Meanwhile on July 31, between the dates of the two purchases, Gibson had notified Saunders he no longer desired to clear through him, but neither Gibson nor Saunders notified Quinn. On August 10 Saunders sent the Department of Agriculture a request to remove Gibson's name as a registrant under Saunders' bond, and subsequently a rider so providing was executed to be effective in October, 1964.

Quinn called on Saunders for the unpaid balance on the second load. Saunders denied responsibility.

U.S.F. & G., the only defendant in this case, claims as a defense that the transaction is not covered by the bond because it was not a purchase or sale made at the Fort Worth yards, and because Saunders did not agree and undertake to clear this specific transaction.

### I

The surety says Saunders legitimately could clear only transactions occurring at the Fort Worth yards, that the bond could cover only transactions which Saunders legitimately could clear, and this not being such there could be no coverage. Thus it is urged that the District Court erred in failing to grant summary judgment, directed verdict and judgment n. o. v. in favor of the surety.

The language of the bond, required by the regulations, contains no such restriction. The bond provides for liability unless Saunders "acting in the capacity of * * * clearing agency * * * shall * * * pay when due, to the person or persons entitled thereto the purchase price for *all livestock purchased by * * * registrants * * *"* (emphasis supplied) Thus, on its face the bond covers payments for all livestock purchased by the registrants without restriction as to site of the purchase.

U.S.F. & G. claims Denver Union Stock Yard Co. v. Producers Livestock Marketing Association, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958) requires we accept its contention. In *Denver Union* the Supreme Court held that for purposes of § 304 of the Act, 7 U.S.C.A. § 205, which imposes on a market agency duties of reasonableness and non-discrimination in the furnishing of services, the phrase "at such stockyards" (defining the places where the duties applied) means every stockyard at which the agency was registered. The surety says that this case establishes not only that the § 205 duties

are co-extensive with the scope of registration but also that the rights and liabilities granted and imposed by other sections of the Act are no more extensive than the scope of registration. Therefore, since Saunders was registered to furnish clearing services only at the Fort Worth yard, he could not legitimately clear purchases made at other yards.

██ But this argument ignores the nature of the service performed by a clearing agency. See State of Colorado v. United States, 219 F.2d 474 (10th Cir., 1954), "Whether one is subject to the provisions of the Act depends upon the character of the activities undertaken and not on where they are performed." Even if it is true (and Denver Union does not so hold) that market agencies rendering physical services such as feeding and water must be registered at every stockyard at which the services are offered, this does not control the present case. Services rendered by a clearing agency are intangible and not subject to the physical limitations imposed by the nature of the service and the necessity of the presence of the livestock. The dealer-registrants who avail themselves of clearing services are a small and selected group of specialists whose activities to which the services relate are by their nature not confined to the yards at which the transactions are "cleared." We conclude that clearing services can be furnished "at a stockyard" without reference to whether the transaction cleared occurred there or elsewhere. From his location at Fort Worth Saunders could and did legitimately clear transactions consummated by Gibson and other dealers at other locations.[9]

In Lewis v. Goldsborough et al., 234 F. Supp. 524 (E.D.Ark., 1964) a dealer-registrant purchased cattle at the Conway, Arkansas, yards, a posted yard under the Act. The clearing agency on whose bond he was a registrant operated at the Fort Smith, Arkansas, posted yard and posted its tariff there. The unpaid seller sued the dealer-registrant, the clearing agency, the trustee listed on the bond, and the surety. The court rejected the contention made by the surety, also made here by U.S.F. & G., that there was coverage only for purchases made by the dealer-registrant at the Fort Smith yards.

██ Our interpretation is in accord with one of the basic objectives of the Act, to impose upon stockyards the nature of public utilities, including the protection for the consuming public that inheres in the nature of a public utility. See Stafford v. Wallace, 258 U.S. 495, 517, 42 S.Ct. 397, 66 L.Ed. 735 (1922); Midwest Farmers v. United States, 64 F. Supp. 91 (D.Minn., 1945). There is no indication in statute or regulations that Gibson, by becoming a registrant on Saunders' bond, did not fulfill entirely his obligations under the Act or that in making this purchase at the Jackson, Mississippi, yards he was in violation of the Act.[10]

If U.S.F. & G.'s position were accepted, many of those dealing with Gibson would be without the protection which the statutory scheme seeks to extend to persons dealing with registered dealers.

Considering the language of the bond, the policies of the Act, the nature of the service involved, and the method of oper-

9. If the surety were correct, Saunders in clearing the sale of the first load (and in clearing similar transactions) would have been committing a criminal violation. 7 U.S.C.A. § 203. We should not presume that a course of dealing is in violation of a criminal provision of the Act. Hartford Accident and Indemnity Co. v. Baldwin, 262 F.2d 202, 206 (8th Cir., 1958); Daugherty v. White, 335 F.2d 94 (9th Cir., 1964).

10. See Fireman's Fund Insurance Co. v. Abilene Livestock Auction Co., 391 S.W. 2d 147 (Tex.Civ.App., 1965), writ ref.

n.r.e., holding that a dealer's bond covered transactions of a registered dealer whether at the stockyard at which registered or at some other duly posted stockyard. This suggests that if Gibson, instead of becoming a registrant on Saunders' bond, had met his statutory duty by posting his own dealer's bond, Quinn Brothers would have been protected. The scope of protection afforded those selling to dealers should not be diminished by the dealer's selecting one of the two alternative methods of meeting the statutory bonding requirement.

ation of the many participants, we are not willing to hold that the clear language of the bond is to be limited by the fact that Saunders' registration application referred only to the Fort Worth yards.

The District Court did not err in refusing to hold as a matter of law that the bond could not cover the transaction at issue. It is not necessary to decide in this case whether the bond would cover transactions of the dealer-registrant carried out at places other than a posted stockyard.[11]

## II

The surety's second contention rests on the language of the bond indicating liability only when the principal fails to meet obligations incurred while it is "acting in the capacity of * * * clearing agency, and thereby being responsible for the financial obligations of other registrants * * *" U.S.F. & G reasons that Saunders acted in the capacity of clearing agency in regard to a specific sale only if in advance he assumed primary responsibility for payment, which it claims Saunders did not do in this case.

■ The factual issue of whether Saunders agreed to clear this transaction was submitted to the jury. Quinn's version of its telephone conversation with Saunders' office before the sale of the first load was to the effect that Saunders thereby undertook to clear all of Gibson's future transactions with Quinn,[12] a version of the conversation the jury was entitled to accept.

The surety makes the argument that to uphold the District Court is to expand potential liability on the bond to an infinite number of transactions over which neither surety nor clearing agency has any control. This misses the issue, which is of liability for a purchase made at a posted yard under circumstances which support a finding that the clearing agency represented to the seller that it would clear purchases from that seller made by a dealer-registrant.

However, it is appropriate that we observe that the outer periphery of liability on the bond is by no means clear from the statutes, the cases, and regulations which are incomplete and confusing. In Lewis v. Goldsborough, supra, the defendants asserted as a second defense that the seller had no notice from or representation by the clearing agency that the dealer was a registrant under its bond or had authority to bind its credit in any of his purchases at the Conway yards. The District Court held liability on the bond to be subject to no such conditions. 234 F.Supp. at 528. We need not, and in this case should not, decide whether this Circuit will adopt such a rule, which makes the clearing agency and its surety virtual guarantors of the dealer-registrant's obligations, bearing in mind that Lewis v. Goldsborough dealt with a bond covering only purchases made at public yards while the bond before us is by its language not so limited. This is a problem for another case or for the authority promulgating the regulations.

11. The bond in Lewis v. Goldsborough, supra, covered the purchase price "for all livestock purchased by such other registrants at a public stockyard as defined in [the Act]." The bond here in suit, pursuant to regulations in effect at the time of the transactions in issue, covers the purchase price "for all livestock purchased by such other registrants."

12. Quinn testified as follows:
"A. I identified myself to Mrs. Barlow [Saunders' secretary and bookkeeper office manager] as Kendall Quinn of Jackson Union Stockyards with Quinn Brothers. I told her that Mr. Norman Gibson had been to our yard the week before and left an order for some calves, he also said [to] check with the T. B. Saunders and Company to be sure they were going to clear him and the answer that she gave me was yes Mr. Gibson is one of our boys, he has been with us for several years and he does clear through us and *any livestock that he might purchase * * * we will pay for.*" (emphasis supplied)

\* \* \*

We have reviewed each specification of error arising out of charges given and requested charges refused. Some of those refused state appellant's erroneous conception of the law already discussed. Some of the given charges were not objected to. Considering the charge as a whole we feel it was correct and fair.

The Mississippi statute of frauds has no application to the disputed conversations between Quinn and Saunders concerning Saunders serving as clearing agency for Gibson. Once Saunders and U.S.F. & G agreed to accept Gibson as a registrant on the bond the obligations and liabilities of the three parties were established by federal law; the statute of frauds does not apply to statutory obligations or those imposed or implied by law. Gate-Way v. Hillgren, 82 F.Supp. 546, 554 (S.D.Cal., 1949), aff'd, 181 F.2d 1010 (9th Cir., 1950); Miller v. Miles, 400 S.W.2d 4 (Tex.Civ. App., 1966) err. ref., n. r. e.

Affirmed.