Robert M. COOK, et al., Plaintiffs,

v.

HARTFORD ACCIDENT AND
INDEMNITY COMPANY,
Defendant.

Civ. No. 85–0–847.

United States District Court,
D. Nebraska.

Jan. 23, 1987.

Law Offices of Robert M. Cook, Norfolk, Neb., for plaintiffs.

Victor J. Lich, Jr., Lich, Herold & Mackiewica, Omaha, Neb., for defendant.

MEMORANDUM OPINION

RICHARD E. ROBINSON, Senior District Judge.

THIS MATTER was tried to the Court on October 22, 1986. The parties have fully briefed the action and the matter is presently ripe for resolution. Jurisdiction is based on the Packers and Stockyards Act, 7 U.S.C. Section 209(b), and 28 U.S.C. Section 1331. The following Memorandum embodies the Court's findings of fact and conclusions of law as mandated by Rule 52(a), Fed.R.Civ.P.

The primary issue presented for resolution is whether the defendant Hartford Accident and Indemnity Company, as surety, is liable on a bond issued to E.K. Corrigan Company, its principal, for the unpaid purchase price of certain cattle purchases

made by one Virgil P. Miller, the action's main protagonist. Secondary issues involve whether prejudgment interest is available on any judgment and whether a trustee and/or attorney fee can be obtained. Each of these issues shall be addressed below.

The facts established at trial and in the record are as follows: E.K. Corrigan Company conducts a livestock marketing and clearing agency business in Omaha, Nebraska. As required by the Packers and Stockyards Act, 7 U.S.C. Section 181 et seq., E.K. Corrigan maintained a bond covering its business transactions and the transactions of those clearing through E.K. Corrigan. *See* 9 C.F.R. 201.29. The Corrigan bond, number 4154636, a copy of which is appended to this Memorandum, was issued by the defendant Hartford Accident and Indemnity Company, as surety, in the amount of $110,000.00 and remained effective through March 1, 1985. *See* exhibit 1. Registrants covered by the bond, *i.e.*, individuals clearing transactions through E.K. Corrigan, were listed on the bond and could be terminated therefrom pursuant to the provisions set out in section (j). *See* exhibit 1. E.K. Corrigan listed, and in the past had terminated, registrants on the bond. One of the registrants listed but never terminated prior to the bond's expiration was Virgil P. Miller.

As stated, E.K. Corrigan provided clearing services to various dealers and traders. According to Curtis R. Brown, president and majority shareholder of E.K. Corrigan, clearing services generally amounted to providing short term financing for the clearees. This clearing relationship worked as follows: a trader or dealer clearing through E.K. Corrigan was provided drafts [1] from the E.K. Corrigan Company. When that trader or dealer purchased livestock to be cleared through E.K. Corrigan, he was authorized to sign and issue a Cor-

rigan draft for the purchase price to the seller. This draft would then be honored by Corrigan and paid from its banking account. It was then understood between E.K. Corrigan, as clearor, and the trader or dealer, as clearee, that the clearee would resell the purchased livestock within a short period of time (frequently within twenty-four hours, sometimes within a week to ten days) and settle accounts with Corrigan. For its services, E.K. Corrigan received a commission of one dollar per head of livestock resold. Though it was established at trial that E.K. Corrigan only cleared transactions conducted with E.K. Corrigan drafts,[2] there was no caveat or restriction embossed on the bond itself indicating that E.K. Corrigan provided clearing services only to those utilizing Corrigan drafts. Rather, the bond's only ostensible limitations on Corrigan clearing services was providing services to those listed as clearees on the Corrigan bond.

Virgil P. Miller, lead protagonist but non-party in this action, was a registered cattle dealer/trader from Treynor, Iowa. For almost thirty years Miller was associated with E.K. Corrigan as a clearee. His name was listed on the Corrigan bond and was not expunged therefrom until the bond expired. Though associated with E.K. Corrigan, Miller was not a Corrigan employee; he was an independent trader and dealer who at times cleared his livestock purchases through Corrigan, and, at others, purchased solely on his own account. As a practice, when clearing through E.K. Corrigan Miller utilized the Corrigan drafts; otherwise he settled for his purchases with his personal check.

The three sales forming the basis claims of this action were transacted by Miller as follows:[3] a) On October 24, 1984, Dean Kinney sold twelve (12) heifers to Virgil Miller for a total purchase price of

---

**1.** For the purposes of this litigation, any dispute as to whether the instrument used in the clearing process was a check or a draft is of no significance.

**2.** Virgil P. Miller testified that he had cleared purchases through E.K. Corrigan made with his personal check. Miller, however, was unable to

recall or cite any specific time when this had happened. Therefore, the most credible evidence supports the defendant's assertion that E.K. Corrigan cleared only transactions conducted on its drafts.

**3.** A fourth sale, which had been part of the original complaint, has since been settled.

$5,222.48. On October 31, 1984, Dean Kinney sold sixty-two (62) steers and heifers to Virgil Miller for a total purchase price of $26,005.90. Miller has paid the sum of $7,028.38 to Dean Kinney and the balance of the purchase price due and owing for the livestock purchased on October 24, 1984, and October 31, 1984 is $24,200.00; b) On December 13, 1984, Willard Kepley sold one hundred (100) steers and heifers to Virgil Miller for a total purchase price of $29,202.06. Miller issued his personal check for the purchase price, but the check was not paid due to insufficient funds in the checking account. The purchase price remains due and owing; c) On December 27, 1984, Dunlap Livestock Auction sold twenty-five (25) cows to Virgil Miller for a total purchase price of $8,975.45. Miller did not pay for the cows and the purchase price remains due and owing. In sum, the total claim of the unpaid sellers of livestock listed above is $62,377.51. *See* exhibits 4, 5, and 6.

All of the unpaid sellers listed above had previously dealt with and knew Miller as a clearee of E.K. Corrigan and all stated they relied on this relation in making the above-noted sales to Miller.[4] These sellers also acknowledge, however, that in previous dealings with Miller they had received Corrigan drafts not personal checks. They were never, on the other hand, informed or alerted to the alleged restriction that E.K. Corrigan cleared only transactions conducted with its drafts. The evidence demonstrated that at no time prior to these sales were the sellers advised by anyone that Miller no longer cleared his transactions through E.K. Corrigan. Miller himself did not notify the sellers of or allude to the alleged limitation when making these purchases. In fact, when Willard Kepley received Miller's personal check for the December 13, 1984, cattle purchase he questioned Miller about the aberration to which Miller responded he had run out of Corrigan drafts.[5] Kepley accepted this explanation. Therefore, the unpaid sellers never had notice that, at the time of the unpaid sales, E.K. Corrigan no longer considered Miller a clearee. While it was established that the sellers did not contact E.K. Corrigan or the Packers and Stockyard Administration to find out whether Miller was still bonded prior to the unpaid sales, it is also apparent that the sellers, when dealing with Miller in the above sales, did so in good faith reliance that the purchases would be cleared through E.K. Corrigan Company.

Each of the unpaid sellers filed timely claims on the bond for payment and the plaintiff-trustee, Robert M. Cook, was duly appointed as trustee by Jack W. Brinkmeyer of the Packers and Stockyards Administration to represent these claimants. *See* exhibits 2, 3, 4, 5, 6, and 7.

■ There was a conflict in the evidence as to whether Virgil Miller was a clearee for E.K. Corrigan when the claimant sales were made in October and November of 1984. The defendant argues that Miller had been terminated as a clearee on August 6, 1984, when Corrigan president, Curtis R. Brown, refused to give Miller additional Corrigan drafts. Miller's outstanding accounts and backlog of cattle precipitated this action. The defendant argues that Corrigan drafts were essential to clearing transactions through E.K. Corrigan and since Miller no longer possessed the indispensable drafts he was no longer an E.K. Corrigan clearee. It is undisputed that after August 6, 1984, Miller did not, in fact, clear any transactions through E.K. Corrigan.

The plaintiff, on the other hand, argues Miller was a Corrigan clearee at the time of the unpaid sales. The Court finds this is the better legal position. The evidence clearly demonstrated that at all pertinent

---

**4.** It appears all the sellers had regular dealings with Virgil Miller except for Dean Kinney who, prior to his October 24, and 31, 1984, sales had not dealt with Miller for several years.

**5.** Of the claims for unpaid sales, Willard Kepley is the only vendor who received a personal check from Virgil Miller. The other vendors never received a payment instrument of any kind. Each, however, testified to having previously received Corrigan drafts in their dealings with Miller.

times, *i.e.*, when the unpaid sales were consummated from October 24 through December 27, 1984, Virgil Miller was listed as a clearee on the E.K. Corrigan bond. In fact, Miller's name was not expunged from the bond at any time prior to its expiration on March 1, 1985. *See* exhibit 1. Additionally, Miller was listed as a trader on Bulletin No. 80 distributed on September 5, 1984, by the Omaha Live Stock Exchange. *See* exhibit 15. Bulletin No. 80, which ostensibly sanctioned Miller's clearing through E.K. Corrigan until November 30, 1984, was neither countermanded nor objected to by Corrigan, even though it clearly conflicted with Corrigan's own view that Miller was no longer a clearee. Finally, the bond itself, through section (j), set out procedures for terminating a registrant therefrom. That section provided "[t]ermination of the clearance of a registrant under condition clause 3 of this bond may be accomplished by issuance of a rider or endorsement by the Surety herein deducting the name of the clearee. Termination of the clearance shall become effective thirty (30) days after the date of receipt of the rider or endorsement by the administrator, Packers and Stockyard Administration, Washington, D.C." E.K. Corrigan neither followed this procedure nor notified its surety, The Packers and Stockyard Administration, or the Omaha Livestock Exchange, that Miller was no longer a clearee at Corrigan's. E.K. Corrigan's first public notification of Miller's altered status came on January 11, 1985, well after the final sale at issue in this litigation. *See* exhibit 101. If Miller was terminated as a Corrigan clearee on August 6, 1984, (as the defendant contends) that fact was not a publicized one. All ostensible signs indicated Miller was an E.K. Corrigan clearee after August 6, 1984, and continued to be so until at least January 11, 1985. The defendant should not now be heard to complain on this account when the entity best suited and in the best position to notify others of Miller's altered status, other than Miller himself,[6] was E.K. Corrigan, the defendant's principal; and yet that company failed to act. Oversight though it may have been, the defendant cannot now compel other innocent individuals (here the unpaid sellers) to shoulder the burden of its principal's failure to notify others that Miller was no longer a clearee. In conclusion, for the purposes of this litigation, the Court shall cast and treat Virgil Miller as an E.K. Corrigan clearee at the time of the claimant sales.

It is axiomatic that a surety is not liable on a bond unless its principal is also liable. Therefore, in order for the plaintiff to succeed in this action he must establish that E.K. Corrigan is liable for the purchases made by Virgil Miller. On the issue of liability the plaintiff advances a twofold argument. First, he relies on the language of the bond itself in fixing E.K. Corrigan's, thus the defendant-surety's, liability. In particular, he makes reference to the following bond provisions:

Applicable if others CLEAR through Principal

(3) If the said Principal, acting as a clearing agency responsible for the financial obligations of other registrants engaged in buying livestock, viz.: (insert here the names of such other registrants as they appear in the application for registration), [registrants name here] or if such other registrants, shall (1) pay when due to the person or persons entitled thereto the purchase price of all livestock purchased by such other registrants for their own account (or) for the accounts of others and (2) safely keep and properly disburse all funds coming into the hands of such Principal or such other registrants for the purpose of paying for livestock purchased for the accounts of others, then this bond shall be null and void, otherwise to remain in full force and

---

**6.** At trial Miller testified that at the time of the sales he still considered himself to be a Corrigan clearee. In Miller's view Brown's refusal to give him additional Corrigan drafts would only last until he had brought his accounts to order, at which time he would obtain additional drafts. E.K. Corrigan's Curtis Brown refutes Miller's interpretation of his refusal to issue Miller additional drafts. One fact, however, is clear: after August 6, 1984, Miller did not clear any additional transactions through E.K. Corrigan.

virtue, subject to the following terms, conditions and limitations:

(i) The acts, omissions or failures of authorized agents or representatives of said Principal or persons whom said Principal shall knowingly permit to represent themselves as acting for said Principal shall be taken and construed to be the acts, omissions, or failures of said Principal and to be within the protection of this bond to the same extent and in the same manner as if they were the personal acts of said Principal.

(j) Termination of the clearance of a registrant under condition clause 3 of this bond may be accomplished by issuance of a rider or endorsement by the Surety herein deducting the name of the clearee. Termination of the clearance shall become effective thirty (30) days after the date of receipt of the rider or endorsement by the Administrator, Packers and Stockyards Administration, Washington, D.C.

The plaintiff asserts that these provisions fix the liability of E.K. Corrigan for the purchases Miller made as a clearee of E.K. Corrigan. In support of this argument the plaintiff leans heavily on the case of *United States Fidelity and Guaranty Company v. Quinn Brothers of Jackson, Inc.*, 384 F.2d 241 (5th Cir.1967).

Plaintiff's second argument turns on agency theory based on the long standing relation between E.K. Corrigan as clearor and Virgil Miller as clearee. He argues that through this relation, a relation known to each of the claimant sellers, E.K. Corrigan cloaked Miller with a mantle of apparent authority to make the purchases at issue and bind E.K. Corrigan to the resultant financial obligations. The plaintiff argues that the sellers reasonably relied on this relation in making the claimant sales since none of them knew or had reason to know of the alleged termination of the clearing relation between E.K. Corrigan and Virgil Miller. It was the defendant's principal's (*i.e.*, E.K. Corrigan's) duty to notify others about the alleged termination; a duty not undertaken until all of the claimant sales had been made.

Finally, the plaintiff argues that the Court cannot infer that Miller, when making the claimant purchases, acted in contravention of the bond requirements of 9 C.F.R. Section 201.29(b) and, therefore, is assumed to have transacted the purchases as a Corrigan clearee. *See Hartford Accident and Indemnity Company v. Baldwin*, 262 F.2d 202, 206 (8th Cir.1958).

The defendant's basic theory is that the claimant sales did not fall within the scope of the bond; therefore, the defendant's principal—E.K. Corrigan, thus the defendant, is not liable on the bond. The defendant advances several reasons in support of this position. The defendant argues it was not responsible for all of the transactions engaged by Virgil Miller but rather was liable only for the ones cleared through E.K. Corrigan. After establishing this initial premise the defendant argues that the claimed unpaid sales were outside the scope of the bond for several reasons. First, Virgil Miller was no longer a E.K. Corrigan clearee at the time of the claimant sales due to Curtis Brown's refusal to advance Miller additional Corrigan drafts after August 6, 1984. Next, the E.K. Corrigan-Miller clearor-clearee relation was triggered only when Corrigan drafts were used in the purchasing transaction. In the claimant sales one seller received Miller's personal check, subsequently dishonored, and the other sellers received no payment instruments at all. This scenario, the defendant argues, did not result in a clearing transaction for which E.K. Corrigan could be held liable, therefore, the defendant as surety, likewise, cannot be held liable. It is the defendant's fundamental contention that the Miller purchases and transactions were entirely outside the scope of the Corrigan bond.

The defendant also argues that the transactions must have actually been cleared through E.K. Corrigan for it to be liable on the bond. In the instant action the defendant argues that the transactions were not actually cleared through Corrigan, therefore, the defendant is not liable on the Corrigan bond. The defendant further argues the Court cannot judicially enlarge a bond to encompass transactions not de-

scribed or covered by the bond. This argument relies on Miller's status as both an independent dealer and an E.K. Corrigan clearee. The defendant contends Miller transacted the claimant purchases as an independent dealer for his own account not as a Corrigan clearee. Upon this view of the facts, the defendant then argues the transactions should be covered by a bond Miller was required to have for his independent dealings. The fact that Miller did not make a bond to cover his independent trading, and therefore, was violating Packers and Stockyard Act regulations, *see* 9 C.F.R. section 201.29(b), does not mean that the Corrigan bond can be judicially expanded to cover the said purchases.

The defendant next argues that state, rather than federal law, fixes the liability of the parties, and that the plaintiff has alleged no theory under state law upon which E.K. Corrigan, thus the defendant, can be held liable for the claimant transactions. The only possible state law theory, the defendant argues, upon which liability could be premised would be the agency theory of apparent authority.[7] The defendant argues the sellers did not rely on the fact that Miller was listed on the bond and cannot claim to have relied on an apparent authority theory because they (the sellers) did not make inquiries of either Miller, the Packers and Stockyard Administration, or E.K. Corrigan, concerning Miller's bond coverage. Due to this absence of inquiry, the defendant contends the sellers cannot be permitted to rely upon the previous transactions with Miller and the general knowledge of Miller as a Corrigan clearee to affix liability on the defendant for the claimant sales. The defendant bolsters this argument by stating the sellers should have been put on notice when Miller failed to use Corrigan drafts in making the purchases and that his failure to use the drafts meant that the transactions were engaged by Miller as an independent dealer rather than as a Corrigan clearee. Based on the above arguments the defendant asserts

that it is not liable for the claimant purchases in this case.

■ Based upon an examination of all the evidence presented, the briefs, and the authorities cited, the Court concludes the plaintiff should prevail on the issue of liability in this action. Initially it must be recognized that the Packers and Stockyards Act, 7 U.S.C. section 181 *et. seq.*, is remedial legislation which should be liberally construed. *See Travelers Indemnity Company v. Manley Cattle Company*, 553 F.2d 943 (5th Cir.1977); *Glover Livestock Comm. Co. v. Hardin*, 454 F.2d 109, 111 (8th Cir.1972), *rev'd on other grounds*, 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973); *Arnold Livestock Sales Company, Inc. v. Pearson*, 383 F.Supp. 1319, 1323 (D.Neb.1974). The purpose of the Act is to protect livestock producers against losses suffered due to sales to insolvent or defaulting purchasers. *See Manley Cattle Co., supra.* Pursuant to 7 U.S.C. section 204, a reasonable bond may be required "from every market agency ... every packer ... and every other person acting as a dealer...." The bonding requirements and regulations applicable to the instant action are set out in 9 C.F.R. Sections 201.27–201.35. It was in compliance with this regulatory scheme that E.K. Corrigan made its bond and listed Virgil Miller as its clearee. Clause 3 of the bond provided: Applicable if others CLEAR through Principal

(3) If the said Principal, acting as a clearing agency responsible for the financial obligations of other registrants engaged in buying livestock, viz.: (insert here the names of such other registrants as they appear in the application for registration), [Virgil Miller was listed here as an E.K. Corrigan registrant] or if such other registrants, shall (1) pay when due to the person or persons entitled thereto the purchase price of all livestock purchased by such other registrants for their own account (or) for the accounts of others

---

7. Though the defendant claims the plaintiff never asserted this theory in his complaint, the defendant dedicated substantially all of its post-trial brief to refuting the theory of apparent

authority. Therefore, the Court shall assume the theory is in issue and will discuss it accordingly.

and (2) safely keep and properly disburse all funds coming into the hands of such Principal or such other registrants for the purpose of paying for livestock purchased for the accounts of others, then this bond shall be null and void, otherwise to remain in full force and virtue, subject to the following terms, conditions and limitations:

Therefore, it appears plainly on the bond itself, through the listing of Miller thereon, that E.K. Corrigan would be responsible for the financial obligations of Miller. The defendant seeks to escape this conclusion by arguing: a) Miller was not a clearee at the time of the sales, having been terminated by Curtis Brown on August 6, 1984; and b) E.K. Corrigan only cleared Miller's purchases transacted on Corrigan drafts.

There are several difficulties with this argument. As previously discussed, the Court finds that Miller was a Corrigan clearee at the time of the claimant sales, therefore the defendant's assertion to the contrary is without merit.

The defendant next argues that Corrigan drafts were necessary to trigger the clearing relation between Corrigan and Miller and since Miller did not utilize Corrigan drafts in making the claimant purchases there was no clearing relation thus no bond coverage for the claimant sales. The difficulty with this argument is that the "Corrigan-drafts only" limitation the defendant seeks to engraft on the bond was never revealed to anyone. There is no such limitation on the bond itself and none of the sellers were aware of this alleged limitation of Corrigan's clearing services. The fact that Miller used only Corrigan drafts in his previous transactions with the claimant sellers does not, in the Court's view, alter the result. Miller's failure to use Corrigan drafts on these occasions is not, when viewed against the long standing relation Miller had with E.K. Corrigan and the lack of any notice concerning the alleged rupture of that business relation, such an unusual circumstance as to put the

sellers on notice that they were dealing with Miller as an independent dealer. Only one of the claimant sales, the sale by Dean Kinney, resulted in Miller issuing a personal check for payment; no payment of any kind was made in the other sales. And Kinney did contact Miller concerning the issuance of a personal check rather than a Corrigan draft, to which Miller responded that he's run out of drafts. Kinney's acceptance of this response was reasonable in light of his knowledge of Miller's longstanding relation with E.K. Corrigan as a clearee.

In *United States Fidelity and Guaranty Company v. Quinn Brothers of Jackson,* 384 F.2d 241 (5th Cir.1967) the court faced a situation similar to the one presented here. *Quinn* also involved an action on a bond under the Packers and Stockyard Act, a bond with language similar to the one at issue. *Id.* at 243 n. 8. The facts of that case are as follows: T.B. Saunders a registered market agency, operated facilities at the Fort Worth stockyards. As required by the Packers and Stockyard Act, Saunders maintained a bond upon which it listed registered dealers clearing through Saunders. At that time the regulation permitted a dealer to fulfill the bond requirement by becoming a registrant on the bond of a marketing agency performing clearing services.[8] Norman Gibson was a registered dealer listed on the Saunders bond. During the week of July 20, 1964, Gibson discussed a purchase of stock with Quinn Brothers at a posted stockyard in Jackson, Mississippi. Gibson represented that clearing services would be provided by Saunders. Quinn, though never having dealt with Gibson, had satisfactorily dealt with another registrant listed as a clearee on Saunders' bond and who cleared purchases from Quinn through Saunders. In late July Quinn sold Gibson a load of cattle for which Gibson paid with a Saunders draft. Saunders honored this draft. Shortly thereafter, on August 7, Gibson purchased

8. This regulation, 9 C.F.R. section 201.29, was amended in 1983 to require dealers to also maintain a bond for their independent buying and selling transactions thus eliminating the choice of either supplying a bond or being included as a clearee on a bond maintained by a clearing agency.

a second load of cattle from Quinn. There was no discussion, however, concerning Saunders clearing the second transaction nor did Gibson issue a draft in payment. Rather, Gibson made partial payment by a cashier's check and failed to pay the balance.

On July 31, after the first sale but before the second sale, Gibson notified Saunders he no longer wished to clear through Saunders. Neither Gibson nor Saunders, however, notified Quinn of this turn of events. Saunders did notify the Department of Agriculture of Gibson's removal request and a rider so removing Gibson was issued effective October, 1964. When Quinn sought payment from Saunders for the balance due on the second load of cattle, Saunders denied responsibility and suit ensued.

The sole defendant in *Quinn Brothers* was United States Fidelity and Guaranty, Saunders' surety. The defendant, asserting the bond did not cover the transaction, pressed two lines of argument: a) the purchase was not made at the Fort Worth yards and b) because Saunders did not agree to undertake and clear this specific transaction it was not covered by the bond.

The court found that the language of the bond, which closely matches the language of the bond at issue, did not restrict the bond as argued by the defendant and stated that "on its face the bond covers payment for all livestock purchased by the registrants without restriction to the site of the purchase." *Id.* at 244. The court also rejected the defendant's contention "that the rights and liabilities granted and imposed by other sections of the Act are no more extensive than the scope of registration." *Id.* at 245. Rather, the court found that provision of clearing services was not limited to the yards at which the transactions are cleared but could be extended to purchases occurring at stockyards other than the one at which the clearing ultimately takes place.

The *Quinn* court also rejected the defendant's argument that the bond applied only when the principal agreed in advance to assume responsibility for the specific purchase.[9]

The court relied upon the fact, as found by the jury, that Saunders had undertaken to clear all of Gibson's future purchases at Quinn's. This representation, the court found, supported the defendant's liability on the bond. The *Quinn* court declined to decide whether the bond would cover a situation in which the seller had no notice or representation from the clearing agency that the purchaser dealer was under its bond or had authority to bind its credit. This situation, however, was presented in *Lewis v. Goldsborough*, 234 F.Supp. 524 (E.D.Ark.1964).

*Lewis v. Goldsborough*, is another case involving a suit upon a bond under the Packers and Stockyards Act. O.H. Goldsborough was a registered dealer and a registrant on the bond maintained by Merchant's Clearing, Inc., of Fort Smith, Arkansas. The pertinent bond provision is similar to the provision (clause 3) in issue at bar. Goldsborough, was known as a bonded buyer at the Mayor Lewis Livestock Auction Sales of Conway, Arkansas prior to October 30, 1961, and generally issued his personal check in payment of purchases. On October 30, 1961, Goldsborough purchased eighty (80) cattle from Lewis and issued a draft drawn on Merchant Clearing in payment. The next day, October 31, 1961, Goldsborough purchased another eighty-one (81) head of cattle from Lewis and issued his personal check in payment therefor. This check was dishonored. This second sale was cleared through Merchants Clearing, Inc. Suit was subsequently filed to recover the unpaid purchase price.

The defendant surety in *Goldsborough* argued that Merchant Clearing, Inc., did not act as a broker or clearing agency with respect to the sale and, therefore, was not liable for the unpaid purchase price. The defendant also argued that the bond was limited to transactions occurring at the Fort Smith Stockyards, the place of Merchants Clearing, Inc.'s, registration, and

---

**9.** The bond language relied upon by the defendant in advancing this argument, see *Quinn Brothers*, 384 F.2d at 246, is strikingly similar to the language of clause 3 in the instant bond.

that the plaintiff prior to the transaction had no notice or representation from Merchants Clearing, Inc., that Goldsborough was its clearee or able to bind its credit by any purchase at Conway, site of the Lewis yard.

The *Goldsborough* court rejected these arguments stating:

> The answer to both of these contentions is contained in the language of the bond which simply provides coverage for purchases made by a registrant at a public stockyard. Nothing in the bond indicated that its provisions are in any way restricted by a tariff filed by a market agency, nor is its liability conditioned upon a representation from the market agency that the registrant has authority to bind its credit.

*Id.* at 528.

*Quinn Brothers* and *Goldsborough* provide persuasive support for the Court's conclusion that the defendant is liable on the bond in this action. Those cases involved facts and bond language similar to that at bar. In the instant action the sellers clearly relied upon Miller's status as a Corrigan clearee in making the claimant sales; that reliance, reasonable under the facts presented, should be protected. *Cf. Hartford Accident and Indemnity Company v. Volin,* 304 F.Supp. 289, 291–92 (D.Minn.1969) (no bond liability where no reliance but of *Quinn Brothers* and *Goldsborough* the court stated, "[i]n those cases, the seller's reliance extended to the clearing agency, and deserved protection, * * * Had Thompson represented himself as Volin's clearee, it may well be that Volin's responsibility would be fixed notwithstanding their contract. The *Lewis* and *Quinn* cases, supra, so hold."). In addition, the defendant, similar to the *Quinn Brothers* and *Lewis* defendants, attempts to escape liability by claiming bond limitations which do not appear on the bonds. These limitations the Court will not abide. Therefore, on the facts presented, the Court finds the defendant liable on the bond for the unpaid purchase prices.

Though not necessary to the decision in this action, the Court finds the defendant's secondary argument that Miller was not its agent is also without merit. The defendant argues that the only apparent authority conferred on Miller arose from his possession of Corrigan drafts and Corrigan's routine payment of those drafts, and Corrigan's oversight in not removing Miller from the Corrigan bond did not create apparent authority because the sellers had no knowledge of this fact and did not rely upon it. In addition, the defendant argues that Miller's failure to use the Corrigan drafts should have alerted the sellers to the fact that Miller was acting without the alleged apparent authority in which E.K. Corrigan cloaked him. In support of this argument the defendant, in its posttrial brief, cites extensively from 3 Am.Jur.2d, *Agency.*

The Court, however, does not find this argument to be a meritorious one. The lack of Corrigan drafts alone did not so alter the pattern of dealing engaged in by Miller as to notify the sellers of the necessity of further inquiry. It is true, as the defendant contends, that "the principal is not bound where the agent exceeds the scope of his apparent authority and his want of authority is known to the person dealing with him, or if the third person actually knows, or should know, the limitations of the agent's authority." 3 Am.Jur.2d, *Agency,* section 75. But it is also true that "[t]he rule is otherwise, ... with regard to secret limitations of the agent's authority which the third person does not know and has no duty or reason to know." *Id.* In this case the limitation on the clearing relation between Corrigan and Miller, *i.e.,* Corrigan drafts only, was an unknown limitation. The unpaid sellers did not actually know of Miller's altered status as a Corrigan clearee and Miller's dealings were not so inconsistent with his prior covered pattern of dealings as to notify the sellers of E.K. Corrigan's alleged revocation of Miller's authority. Rather, E.K. Corrigan neglected to perform its own duty by failing to notify others that Miller had been terminated as a clearee. This neglect should not be shifted to the sellers to bear.

■ The next issues presented for resolution are whether prejudgment interest and an attorney's or trustee's fee are available to the plaintiff.

On the issue of prejudgment interest the plaintiff argues, and the defendant agrees, that the matter is a discretionary one for the Court. It is clear that the Packers and Stockyard Act neither prohibits nor demands that prejudgment interest be awarded. The Act does admonish, however, that "[i]f any person subject to this chapter violates any of the provisions of this chapter, ..., relating to the purchase, sale, or handling of livestock, he shall be liable to the person or persons injured thereby for full amount of damages sustained in consequence of such violation." *See* 7 U.S.C. section 209(a). This matter, contrary to the defendant's argument that Nebraska's restrictive rules on liquidated damages control, is controlled by federal law. *See Rowse v. Platte Valley Livestock, Inc.*, 604 F.Supp. 1463, 1470 (D.Neb.1985) ("Nebraska's restrictive rules on liquidation do not control the availability of prejudgment interest under either the Interstate Commerce Act or the Packers and Stockyard Act.") The theory behind prejudgment is to "[help] compensate plaintiffs for the time cost of money damages they have incurred." *General Facilities v. National Marine Service, Inc.*, 664 F.2d 672, 673 (8th Cir.1981).

Based on the foregoing authorities, the Court finds that prejudgment interest is available and should be awarded in this action. The unpaid purchase prices which are the issue at bar have been unavailable to the sellers since at least December, 1984. The sellers should be compensated for the loss of the funds' availability with an award of prejudgment interest. Federal law clearly supports this conclusion. It also appears that prejudgment interest would be available under Nebraska law. In *Nebraska Public Power District v. Borg-Warner*, 621 F.2d 282 (8th Cir.1980), the court recognized that Nebraska law allows prejudgment interest when the amount of the claim is liquidated. In Nebraska, the term liquidated is defined as:

A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion. Examples are claims upon promises to pay a fixed sum, claims for money had and received, claims for money paid out, and claims for goods or services to be paid for at an agreed rate. [*Abbott v. Abbott*, 188 Neb. 61, 195 N.W.2d 204, 209 (1972) (citations omitted), *quoting* McCormick, *Damages* section 54 (1935).]

*Id.* at 285.

The court stated further that "a common theme in Nebraska caselaw is that [liquidated] damages must be 'readily determinable' or 'ascertainable by computation or a recognized standard.'" *Id.* at 286. In the instant case there has been no dispute as to the amount of the unpaid purchase prices. Though originally there were four claims of unpaid sales, one having been subsequently settled, this does not alter the ready identification of the amount claimed to be due and owing. Therefore, even under Nebraska law it appears prejudgment would be available in this action.

The final issue for resolution is the availability of a trustee's and/or attorney's fee for the plaintiff in this action. The plaintiff is Robert M. Cook, trustee representative of the claimant sellers herein. Mr. Cook is also the attorney bringing this action on the bond, therefore, his variant roles as trustee and attorney are virtually indistinguishable. The problem with this melding of roles arises from determining the source of the available fees, if any. Neither the statute nor the bond provide for the payment of either a trustee's or attorney's fees or costs. But letters by Jack Brinkmeyer indicate that the courts have awarded *trustee* fees and costs from the proceeds of the bond. See exhibits 2, 7 (Hartford letter), and 10.

In his brief the plaintiff argues that the Packers and Stockyards Act is silent on the issue of an attorney's fees in an action on a bond. Therefore, he argues, the Court should assess the request for an attorney's fees under provision of state statutes. In

this regard the plaintiff relies on the cases of *Lewis v. Goldsborough,* 234 F.Supp. 524 (E.D.Ark.1964) and *Baldwin v. Hartford Accident and Indemnity Company,* 168 F.Supp. 86 (D.Neb.), *aff'd* 262 F.2d 202 (8th Cir.1958). The plaintiff also makes policy arguments in favor of awarding a trustee's fee.

In this action neither the bond nor the rules regulating the bond, 9 C.F.R. section 201 provide for an attorney's fees. *Cf.* 7 U.S.C. section 210(f) (attorney's fees available in suit to enforce Secretary's order for reparation). In light of this statutory silence, several courts, when confronted with a request for an attorney's fee in a suit on a Packers and Stockyards Act bond, have looked to state law in determining whether an attorney's fee should be awarded. In *Baldwin v. Hartford Accident and Indemnity Company,* 168 F.Supp. 86, 116 (D.Neb.), *aff'd* 262 F.2d 202, 205 (8th Cir. 1958), District Court Judge Delehant awarded an attorney's fee in a bond suit similar to the case at bar on the strength of a Nebraska statute. The statute, Neb.Rev. Stat. section 44–359, allowed recovery of a reasonable attorney's fee "[i]n all cases where the beneficiary, or other person entitled thereto, brings an action upon any type of insurance policy ... against any company, person or association doing business in this state...." Judge Delehant applied this statute to the action despite the fact that the action was brought in federal rather than state court. Judge Delehant's ruling, however, was limited only to awarding an attorney's fee and did not address the issue of a trustee's fee or costs, stating,

> the court has limited its thinking solely to the question whether the trustee plaintiff has the right to the recovery, as part of the costs of the action, and against the defendant, Hartford Accident and Indemnity Company, of a fee for his attorney. It has not reached, and does not discuss, the other and quite different problem, which is not now presented, whether, as against the beneficiaries of his trust he might be entitled to an award on account of the expenses of the litigation whereby

a fund distributable to such beneficiaries has been recovered or protected. *Id.*

In *Baldwin,* unlike the instant action, the trustee and attorney were separate individuals.

On appeal, the Eighth Circuit affirmed Judge Delehant's ruling in regard to the award of an attorney's fee on the basis of the Nebraska statute. *Hartford Accident and Indemnity Company v. Baldwin,* 262 F.2d 202, 205 (8th Cir.1958). The Eighth Circuit acknowledged that the issue concerning the attorney's fee had not been "urged in argument at the bar or in the brief and we may consider it abandoned", but nevertheless, reached out and decided the issue stating "[i]t [*i.e.,* any objection] is in any event without merit." *Id.*

A similar result was reached in *Lewis v. Goldsborough,* 234 F.Supp. 524, 530 (E.D. Ark.1964), another suit on a Packers and Stockyard Act bond. In *Lewis,* the district court distinguished between the various provisions of the Packers and Stockyards Act and recognized that section 204 was silent on the issue of awarding an attorney's fee. The court then relied upon *United States For the Use and Benefit of Magnolia Petroleum Co. v. H.R. Henderson and Co.,* 126 F.Supp. 626, 637 (W.D.Ark.1955) (which had construed the Miller Act, also silent on the issue of an attorney's fee, in light of an Arkansas statute which allowed assessment of an attorney's fee against sureties) for the proposition that state law governed the award of an attorney's fee. In *Lewis,* the district court awarded an attorney's fee based upon the Arkansas statute. *Id.* See also *United States Fidelity and Guaranty Company v. Clover Creek Cattle Company,* 92 Idaho 889, 452 P.2d 993, 1004–05 (1969) (in suit on Packers and Stockyards Act bond court awarded an attorney's fee based on Idaho statute).

This issue has been ruled upon more recently in the District of Nebraska. In *Becker v. Kozo,* 53 F.R.D. 416, 423 (D.Neb. 1971), an action on a bond written under the Packers and Stockyards Act, Judge Urbom found that an attorney's fee was re-

coverable, stating simply "[a] fee should be allowed the plaintiffs' counsel in the amount of Three Thousand Dollars ($3,000.00)." *But cf, Arnold Livestock Sales Company, Inc. v. Pearson,* 383 F.Supp. 1319, 1323 (D.Neb.1974) (where, in a similar action, the court rejected plaintiff's request for an attorney's fee stating the "[p]laintiff seeks attorneys' fees under 7 U.S.C. Section 210(f), but that section does not apply to actions on bonds under 7 U.S.C. section 204 and the Court finds no justification for granting such fees.").

■ Based on the statutory authority of Neb.Rev.Stat. section 44–359 and the foregoing case law, the Court concludes that a reasonable attorney's fee should be awarded in this action. Furthermore, a strong policy argument supports sanctioning an award of an attorney's fee in this action. As stated previously, the rationale undergirding the Packers and Stockyards Act bond requirement is to protect the producer from financial loss in dealing with bankrupt or defaulting dealers. This rationale is subverted when the producer is compelled to sue on the bond and incur the legal expenses, including attorney's fees, inherent therein. In this scenario the proceeds of the bond, originally designed to protect the producer's selling price, are partially diverted to compensate the producer's attorney rather than making the producer fiscally whole. For these reasons the Court shall award the plaintiff a reasonable attorney's fee in this action. This fee, at the rate of sixty-five ($65.00) dollars per hour,[10] shall be assessed for payment against the defendant surety.

■ The Court also finds that a trustee's fee should be awarded in this action. Again, policy reasons strongly suggest this conclusion. Though neither the statute nor the bond itself provide for the payment of a trustee fee or costs incurred by the trustee, to deny this claim would inhibit potential trustees from accepting assignments in this area. The trustee's costs and fee, however, shall be assessed against the proceeds of the bond rather than against the defendant. The Court finds that a reasonable trustee's fee in this action is forty ($40.00) dollars per hour.

Robert M. Cook, trustee and attorney in this action, has supplied the Court with a computer printout of the time expended and the costs incurred in pursuing this matter. *See* exhibit 25. The accuracy of this exhibit has not been challenged. In an effort to distinguish the trustee's fee and costs from the attorney's fee and costs the Court has examined this printout and makes the following findings: a) the hours expended and costs incurred up to and including July 30, 1985, shall be attributed to the trustee's activities; and b) the hours expended and the costs incurred thereafter shall be attributed as attorney's activities. Therefore, for section (a) above the Court awards Robert M. Cook, as trustee, the following amounts: a trustee's fee in the amount of $1,200.00 (reflecting 30 hours of work multiplied by forty ($40.00) dollars per hour) and costs in the amount of $168.51; for a total of $1,368.51 which amount is assessed against the proceeds recovered on the bond.[11] For section (b) above the Court awards Robert M. Cook, as attorney, the following amounts: an attorney's fee in the amount of $12,482.50, which represents a rate of sixty-five ($65.00) dollars per hour for 165.6 hours[12] of time expended by Robert M. Cook and a rate of thirty-five ($35.00) dollars per hour for 49.1 hours expended by Steven G. Wortmann; and costs in the amount of $894.56, for a total of $13,737.06. This

---

**10.** Though Robert M. Cook's rate of compensation shall be sixty-five ($65.00) dollars per hour, Steven G. Wortmann's time shall be billed at thirty-five ($35.00) dollars per hour.

**11.** After this amount has been deducted from the bond proceeds, the remaining proceeds should be divided among the unpaid sellers according to their proportionate interests.

**12.** This total number of hours credited to Robert M. Cook as attorney does not include the time spent on September 24, 1985 and October 2, 1985, on activities related to the Dennison Livestock claim. That claim was settled prior to suit and time so spent will not be attributed to this litigation.

amount shall be assessed against the defendant surety.

An Order reflecting the Court's Memorandum shall be filed herewith.

---

BOND NO. 4154636

**BOND REQUIRED OF LIVESTOCK MARKET AGENCIES AND DEALERS UNDER THE PACKERS AND STOCKYARDS ACT, 1921, AS AMENDED**

KNOW ALL MEN BY THESE PRESENTS, that we E. K. Corrigan Co., & Curtis Richard Brown

of Omaha, Nebraska

as Principal, and Hartford Accident and Indemnity Company

as Surety, are held and firmly bound unto R. B. Cunningham, Secretary Omaha Livestock Exchange
(TRUSTEE NEED NOT BE NAMED UNLESS REQUIRED BY STATE, PRINCIPAL, OR SURETY)

(or his successors in official position, if any) as Trustee for all persons who may be damaged through the breach of this bond, in the obligatory in the aggregate sum of Seventy-five thousand and no/100— — — — — — — — — Dollars ($ 75,000.00 ), lawful money of the United States of America, for the payment whereof to the Obligee we bind ourselves, our heirs, executors, administrators, successors and assigns jointly and severally by these presents.

Signed, sealed and dated this 17th day of February , 1975 .

Now, Therefore, the Condition of this Bond is such that:

Applicable if Principal SELLS on commission — (1) If the said Principal shall pay when due to the person or persons entitled thereto the gross amount, less lawful charges, for which all livestock is sold for the accounts of others by said Principal,

Applicable if Principal BUYS on commission or as a dealer — (2) If the said Principal shall pay when due to the person or persons entitled thereto the purchase price of all livestock purchased by said Principal for his own account or for the accounts of others, and if the said Principal shall safely keep and properly disburse all funds, if any, which come into his hands for the purpose of paying for livestock purchased for the accounts of others,

Applicable if others CLEAR through Principal — (3) If the said Principal, acting as a clearing agency responsible for the financial obligations of other registrants engaged in buying livestock, viz.: (insert here the names of such other registrants as they appear in the application for registration),

or if such other registrants, shall (1) pay when due to the person or persons entitled thereto the purchase price of all livestock purchased by such other registrants for their own account or for the accounts of others and (2) safely keep and properly disburse all funds coming into the hands of such Principal or such other registrants for the purpose of paying for livestock purchased for the accounts of others,

then this bond shall be null and void, otherwise to remain in full force and virtue, subject to the following terms, conditions, and limitations:

(a) This bond shall apply only to transactions occurring on or at any time after the date hereof, and before the effective date of termination hereof as hereinafter provided.

(b) Payment by the Surety to a claimant or to the Trustee in settlement of one or more claims shall discharge the Surety as to those claims and shall reduce the penal sum of this bond to the extent of such payment or payments.

(c) Any person damaged by failure of the Principal to comply with any condition clause of this bond, may maintain suit in his own name to recover on this bond even though such person is not a party named in this bond. The Trustee may maintain suit in his own name, the recovery to be made for the use of the persons damaged. Principal and Surety hereby waive every defense, if any there be, based on the fact that any person damaged or in whose name a suit shall be brought, is not a party or privy to this bond.

(d) Any claim for recovery on this bond must be filed in writing with either the Surety, or the Trustee if one is named, the Administrator, Packers and Stockyards Administration, United States Department of Agriculture, Washington, D.C. 20250, and whichever of these parties receives such a claim shall notify the other such parties or parties at the earliest practicable date. All claims must be filed within 120 days of the date of the transaction on which claim is made. Suit thereon shall not be commenced in less than 180 or more than 547 days (which is approximately 18 months) from the date of the transaction on which the claim is based.

(e) The Administrator, Packers and Stockyards Administration, United States Department of Agriculture, is authorized to designate a Trustee to represent all claimants under this bond if (1) any claim is filed or any action is required to recover damages for breach of any condition of this bond, and if (2) a Trustee is not designated herein or the Trustee designated herein fails or is unable to act or serve.

(f) The Surety shall not be liable to pay any claim for recovery on this bond if it is not filed in writing within 120 days from the date of the transaction on which the claim is based, or if suit thereon is commenced less than 180 or more than 547 days (which is approximately 18 months) from the date of the transaction on which the claim is based.

(g) The proceeds of this bond shall not be used to pay any fees, salaries, or expenses for legal representation of the Surety or the Principal.

(h) The term "person" as used in this bond shall be construed to mean and include both singular and plural, corporations, partnerships, associations, individuals, and the heirs, executors, administrators, successors, or assigns thereof.

(i) The acts, omissions or failures of authorized agents or representatives of said Principal or persons whom said Principal shall knowingly permit to represent themselves as acting for said Principal shall be taken and construed to be the acts, omissions, or failures of said Principal and to be within the protection of this bond to the same extent and in the same manner as if they were the personal acts of said Principal.

(j) Termination of the clearance of a registrant under condition clause 3 of this bond may be accomplished by issuance of a rider or endorsement by the Surety herein deducting the name of the clearee. Termination of the clearance shall become effective thirty (30) days after the date of receipt of the rider or endorsement by the Administrator, Packers and Stockyards Administration, Washington, D.C.

(k) This bond may be terminated by either party hereto delivering written notice of termination to the other party and the Administrator of the Packers and Stockyards Administration at Washington, D.C., at least thirty (30) days prior to the effective date of such termination. In the event that the Surety named herein written a new bond to replace this bond for the same Principal named herein, the 30-day termination provision will be waived, and this bond will become terminated as of the effective date of the replacement bond. Immediately upon filing of a claim for recovery on this bond, unless the Surety believes that such claim is frivolous, the Surety shall cause termination of this bond in accordance with this paragraph.

(l) A fully executed duplicate of this bond and of any endorsement, amendment, rider, or other attachment hereto, shall be filed with the Area Supervisor, Packers and Stockyards Administration, for the area in which the Principal resides or has his or its principal place of business.

(m) Conditions ____ and ____ were deleted prior to execution and are not part hereof.

IN WITNESS WHEREOF the parties hereto have executed this bond under their seals on the day and date appearing herein.

E. K. CORRIGAN CO.
(Principal)

By Curtis Richard Brown
No 304

Hartford Accident and Indemnity Company
(Surety)

Georgiana Olson Attorney-in-Fact

R. B. Cunningham
(Trustee — if named)

[Marginal handwritten notes alongside form:] the insured by the acceptance of this bond gives notice to the underwriter terminating or cancelling prior bond No. 4154636 effective 2 17 73, such termination or cancellation to be effective at the time this bond becomes effective.

3 JAN 75 13:4